**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**WONG KIM BO, a/k/a Yee Kuk Ho,
etc., Defendant-Appellant.**

**No. 71-1928.**

United States Court of Appeals,
Fifth Circuit.

Aug. 7, 1972.

Rehearing Denied Dec. 18, 1972.

Anthony S. Battaglia, Howard P. Ross, Parker, Battaglia & Ross, St. Petersburg, Fla., for defendant-appellant.

John L. Briggs, U. S. Atty., William M. James, Jr., Claude H. Tison, Jr., Tampa, Fla., for plaintiff-appellee.

Before JOHN R. BROWN, Chief Judge, and GOLDBERG and MORGAN, Circuit Judges.

JOHN R. BROWN, Chief Judge:

Wong Kim Bo, a many named person,[1] appeals from his conviction and consequent one year sentence for being found unlawfully in this country after having once been arrested and deported in violation of 8 U.S.C.A. § 1326.[2] We are of

---

1. a/k/a Yee Kuk Ho, a/k/a Yee Chuck Ho, a/k/a Chuck Yee, a/k/a C. Yee, a/k/a Chuck H. Yee, a/k/a Lee Chuck Shim, a/k/a Chuck Shim, a/k/a Henry Lew.

2. "Any alien who—
   (1) has been arrested and deported or excluded and deported, and thereafter

the view that the Government failed to prove an essential element of the criminal offense—namely, that the defendant was "arrested" as that term is contemplated by the statute—and accordingly we reverse the conviction.

### The Facts—Coming and Going and Coming

Desirous of leaving his native Hong Kong, China, in 1959 defendant purchased a Canadian father for the sum of $2200, or more accurately, he acquired certain papers indicating, fraudulently, that he had such a Canadian father and was therefore a Citizen of Canada. On the basis of that Canadian Naturalization Certificate, he entered Canada and obtained a Canadian passport. Subsequently, in 1963, he entered the United States at Portal, North Dakota, as a visitor, but remained in this country substantially beyond the 6 months allowed a non-immigrant visitor.

> (2) enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously excluded and deported, unless such alien shall establish that he was not required to obtain such advance consent under this chapter or any prior Act,
> shall be guilty of a felony, and upon conviction thereof, be punished by imprisonment of not more than two years, or by a fine of not more than $1,000, or both."

3. The defendant identified himself as Yee Kuk Ho, saying that he was a citizen of Canada born in Hong Kong. On request for identification he produced a certificate of Canadian citizenship and a Canadian passport identifying him as Lee Chuck Shim, born in Kwang-Tung, China. Questioned about the discrepancy, he readily admitted that the papers had been fraudulently obtained, that he had purchased them some ten years earlier for $2,200 and that he had used them to enter the United States.

4. The arrest by the Border Agent, which is authorized by 8 U.S.C.A. § 1357 and 8 C.F.R. § 287, is simply a cautionary

In September 1968 the defendant went to the Tampa, Florida, office of the Immigration and Naturalization Service to inquire about the detention of his employer, a fellow countryman, and to attempt to secure his release. During that interview, defendant presented his Certificate of Canadian Citizenship and Canadian passport, which due to certain discrepancies [3] led the Border Patrol Agent to arrest the defendant for being illegally in the United States.[4] Although no criminal prosecution was ever brought or contemplated, a Show Cause Order was issued directing the defendant to demonstrate why he was not a deportable alien "in that, after admission as a non-immigrant under Section 101(a)(15) of said Act [5] you have remained in the United States for a longer time than permitted."

Thereafter, a hearing was held before a Special Inquiry Officer during which the defendant, represented by counsel,

measure intended to prevent the escape of persons suspected of entering or being in this country illegally pending a determination of whether or not a show cause order should issue. It may be warrantless. Since such an arrest is by no means prerequisite to deportation proceedings it suffers the same lack of rational subservience to the purposes of the criminal (§ 1326) statute as does the § 242.2 arrest. Both § 242.2 and § 1357 are discretionary, pre-final order of deportation, administrative tools and neither is premised upon a finding of deportability. Moreover, the § 1357 arrest being without warrant, the congressional purpose of including "arrest" as an element of the criminal offense is not even served to the extent of advising the alien that if a show cause order is thereafter issued, and if a finding of deportability is thereafter made, and if an order of deportation rather than permission to depart voluntarily is thereafter rendered, and if the alien is thereafter deported, and if he thereafter re-enters the country without obtaining permission from the Attorney General, that he will be subject to criminal penalties. In other words, the § 1357 arrest in no way furthers the congressional purpose of § 1326 to control the re-entry of deported aliens.

5. Immigration and Nationality Act, 8 U.S. C.A. § 1101(a)(15).

admitted his deportability but requested to be granted the privilege of voluntary departure from this country in lieu of deportation.[6] The Special Inquiry Officer granted that discretionary relief and on January 15, 1969, entered his formal decision ordering that "in lieu of an order of deportation the respondent be granted voluntary departure without expense to the Government on or before February 14, 1969, or any extension beyond such date as may be granted by the district director, and under such conditions as the district director shall direct." The decision further ordered that "if the respondent fails to depart when and as required, the privilege of voluntary departure shall be withdrawn without further notice or proceedings and the following order [7] shall thereupon become immediately effective: the respondent shall be deported from the United States to Canada on the charge(s) contained in the Order to Show Cause." Importantly, no warrant of deportation (Form I–205) was issued at this or any other point in these proceedings. The effect of the order of January 15 was, therefore, an automatic, self-executing order of deportation if the defendant remained in the country beyond February 14, 1969, without having obtained an extension from the District Director of INS.[8]

■■ Foolishly procrastinating until the proverbial last-minute and despite a warning by the INS, the defendant made no effort to secure arrangements for his departure until the last day—February 14, 1969. To his unhappy surprise, if not consternation, when he presented himself at an airport seeking passage out of the country on that day, he was informed that international space was unavailable due primarily to the midseason rush of weekend "jet-setters" seeking refuge from the bitter ravages of the eastern winter in the travel poster-promised sun-kissed Xanadus of distant lands. Recognizing the awkwardness of the predicament, the defendant telephoned his attorney in Miami. The attorney, like the flight space, was not available, so the defendant discussed his problem with the attorney's chief assistant, an interpreter, translator, general clerk and modern day paralegal who had been employed by the law firm for over 16 years specializing in immigration matters such as supervising filing of forms, talking with clients, and consulting with INS officials. This clerk immediately telephoned one of the INS of-

---

6. 8 U.S.C.A. § 1254(e) provides:

   The Attorney General may, in his discretion, permit any alien under deportation proceedings, other than an alien within the provisions of paragraph (4), (5), (6), (7), (11), (12), (14), (15), (16), (17), or (18) of section 1251(a) of this title (and also any alien within the purview of such paragraphs if he is also within the provisions of paragraph (2) of subsection (a) of this section), to depart voluntarily from the United States at his own expense in lieu of deportation if such alien shall establish to the satisfaction of the Attorney General that he is, and has been, a person of good moral character for at least five years immediately preceding his application for voluntary departure under this subsection.

   This discretionary authority has been delegated to the special inquiry officers by 8 C.F.R. § 244.1. See Aalund v.

Marshall, 5 Cir., 1972, 461 F.2d 710 [1972].

7. The Special Inquiry Officer's "order" is not final until subsequently. See text, *infra.* Therefore it is not the functional equivalent of a warrant of deportation which has all the attributes of effecting an "arrest". See discussion, *infra.*

8. C.F.R. § 244.2 provides:

   Authority to extend the time within which to depart voluntarily specified initially by a special inquiry officer or the Board is within the sole jurisdiction of the district director. A request by an alien for an extension of time within which to depart voluntarily shall be filed with the district director having jurisdiction over the alien's place of residence. Written notice of the district director's decision shall be served upon the alien, and no appeal may be taken therefrom.

ficials in the deportation division [9] with whom he had had numerous dealings over the years in such matters. According to the Clerk the INS official said, exactly, "It's all right if he leaves on Monday [February 17]." The fact of this reprieve was relayed to the defendant and as suggested by the telephone communication, defendant left the country destined for Nassau on February 17.

The Nassau junket was brief and on February 19 the defendant returned to this country on a non-immigrant visitor's visa (obtained by the use of the purchased Canadian papers of which the INS had carelessly neglected to relieve him) but without obtaining permission from the Attorney General. He was subsequently found in this country, whereupon a criminal investigation was commenced, culminating in the present conviction, sentence and appeal.

9. The clerk was unable to recall which of two INS officials he spoke to. He was certain that it was one of two particular individuals, but simply could not remember which one. For this reason the District Court would not allow testimony about the telephone call.

Although identification is required before a telephone conversation is admissible, the standard of certainty is simply one of "reasonableness." United States v. Bucur, 7 Cir., 1952, 194 F.2d 297, 303–304; Morton v. United States, 7 Cir., 1932, 60 F.2d 696. Here the witness was absolutely certain that he spoke to one of two particular individuals, he knew definitely at that time to whom he was speaking, he recalled the telephone number and the names of both parties, and he had dealt with these individuals often enough in the past to recognize their voices over the telephone. Passage of time had simply deprived him of positive memory of which one he spoke to (though he thought it was Mr. Eldred). Under the circumstances, the identification was sufficiently and reasonably enough certain for the conversation to be admissible.

This is particularly true here because of the peculiarly lenient rules regarding conversations with business offices. See, Admissibility of Telephone Conversations in Evidence, 71 ALR 5, 14:

## The Offense Charged—Return After Arrest and Deportation

■ Contrary to the advice of the District Director who recommended that the case be dismissed or nolle prossed, the United States Attorney sought to prosecute the defendant under 8 U.S.C. A. § 1326.[10] Carving from the statute the five particular elements ([i] through [v]) applicable to the facts of this case, the indictment charged that, "on or about September 5, 1969, [defendant], an [i] alien who had theretofore been [ii] arrested and [iii] deported from the United States of America on or about February 17, 1969, [v] without having the Attorney General's express consent to re-apply for admission to the United States, was [iv] found unlawfully in the United States, in the Middle District of Florida; in violation of Section 1326, Title 8, United States Code.[11]

" * * * If the communication was such that it might have been properly made to one found at such office or place of business, who is assumed to have authority to receive it, and who, so far as the contrary appears, did have such authority, *the telephonic conversation is admissible without further evidence to identify the particular person with whom it was had * * *.*" (Emphasis supplied.)

10. The District Director wrote two letters to the United States Attorney setting forth several reasons why criminal prosecution of the case would be unwise. He expressly opined that the defendant had not been arrested within the meaning of the statute. See note 19, *infra*. Of course, the determination whether to prosecute or nolle pros is the exclusive responsibility of the Executive here acting through the Attorney General. See United States v. Cox, 5 Cir. (en banc), 1965, 342 F.2d 167, cert. denied sub. nom. Hauberg v. Cox, 381 U.S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700 and especially 342 F.2d at 183 n. 5 (Brown, J. concurring specially).

11. Defendant was also charged with false impersonation in an effort to enter the United States (a violation of 18 U.S.C.A. § 1546), but that count resulted in a directed verdict of acquittal at the close of the evidence.

■ It is readily apparent that there are at least five elements to the particular offense charged which the government must prove in order to obtain a conviction: [i] that defendant was an alien, [ii] and [iii] that he was "arrested" and "deported" as those terms are contemplated by the statute, [iv] that he was subsequently found within this country, and [v] that he did not have consent from the Attorney General to reapply for admission. Elements (i), (iv), and (v) are not in dispute and the gravamen of defendant's argument is that he was neither "arrested" nor "deported" within the meaning of the statute.[12] Since we determine that he must prevail on the "arrest" issue we need not determine the question of whether or not he was in fact deported or whether his exodus from the country was under the aegis of voluntary departure.

*Arrest—Statutory Interpretation in a Vacuum*

The statute, at least that part of it involved here, imposes criminal sanctions for re-entry without the Attorney General's permission only when the alien has previously been "[ii] arrested and [iii] deported". The problem is, what kind of "arrest" is contemplated by this statute? That inquiry turns on reasoning why Congress would require both "arrest *and* deportation" instead of mere deportation alone to trigger the criminal sanctions. A preliminary understanding of INS procedures is necessary at this point.

"Every proceeding to determine the deportability of an alien in the United States is commenced by the issuance and service of an order to show cause by the services." 8 CFR § 242.1. At the time of the issuance of the show cause order, or at any time thereafter, the district director may issue a warrant for the arrest of the alien. "However, such warrant may be issued by no one other than a district director, acting district director, or deputy district director, and then only whenever, in his discretion, it appears that the arrest of the respondent is necessary or desirable." 8 C.F.R. § 242.2 [13] and 8 U.S.C.A. § 1252(a). If the hearing on the show cause order before the Special Inquiry Officer results in a determination of deportability and a denial of discretionary voluntary departure in lieu of deportation and after exhaustion, waiver or expiration of time for appellate review, an order of deportation issued by the Special Inquiry Officer or the Board of Immigration Appeals becomes final. 8 C.F.R. § 243.1. Thereafter, but only if voluntary departure is denied or the deportation aspect of the Special Inquiry Officer's order becomes otherwise operable, as for example, by failure to voluntarily depart as arranged,[14] a Warrant of Deportation of the alien (INS Form I-205) is issued directing any officer or employee of the INS to *take into custody* and deport the said alien pursuant to law * * *." (Emphasis added). The issuance of a Warrant of Deportation is mandatory under 8 C.F.R. § 243.2 [15] unless the alien has been granted the privilege of volun-

12. The thrust of the argument that there was no deportation is that the date for voluntary departure was extended either by (i) particular language in the Form I-210 ("Failure to depart on or before the specified date *may* result in the withdrawal of voluntary departure and *steps being taken* to effect your deportation"), or (ii) the telephone conversation of February 14 with deportation officials (see text, *supra*) or both. We do not reach either of these contentions.

13. The arrest of the alien in the present case was not really a § 242.2 arrest since it was not authorized by any of the offi-

cials mentioned in the regulation, but we can assume that his arrest, under color of 8 U.S.C.A. § 1357 (see note 4, *supra*) was the functional equivalent of a § 242.2 arrest.

14. In the present case no warrant of deportation was issued despite appellant's failure to depart on February 14. See discussion, text, *supra*.

15. "A warrant or deportation based upon the final administrative order of deportation in the alien's case shall be issued by a district· director. The district director shall exercise the author-

tary departure, in which case he is not "deported" at all. At this point the alien is served either personally or by certified mail with Form I–294 (Appendix A) informing him in his native tongue of the penalties which can be imposed should he return to this country after deportation without obtaining permission from the Attorney General. Normally the custody of the alien is secured by sending him a notice to surrender for deportation (Form I–166—Appendix B) and voluntary surrender at the time and place described, rather than by a traditional, formal "arrest".

It is therefore apparent that INS procedures provide for two kinds of arrests —(i) the § 242.2 pre-hearing discretionary arrest or (ii) the § 243.2 mandatory arrest directed by the Warrant of Deportation. Our question is, to which of these "arrests" does the criminal statute refer? We are of the view that the statute contemplates the latter situation.

Initially we observe that were the fact of deportation alone intended by Congress to satisfy the statute, the term "arrest and" would be surplusage. Obviously Congress intended that some further showing must be made before criminal sanctions attach to reentry into this country without the approval of the Attorney General after deportation.

Why should Congress require more? Certainly once a determination is made that an alien should not remain in or enter this country, Congress intends that the alien should not reenter without permission of the Attorney General. Clearly, criminal sanctions are appropriate to effectuate this policy. On the other hand, Congress might understandably hesitate to impose criminal sanctions for reentry where the alien does not know or realize that he has been officially ordered deported. The arrest of an alien *after* an order of deportation has become final provides great assurance that the alien understands that he is being offi-

cially deported. Although there is no legislative history relating to the "arrest and deportation" language here in issue, the extensive House Report on the Immigration and Nationality Act of 1952 clearly indicates a Congressional preoccupation with procedural fairness in deportation and exclusion situations. See 1952 U.S. Code Cong. & Adm. News, pp. 1710–1713. The procedural safeguards embodied in the 1952 legislation and the legislative history explaining them leads us to conclude that Congress affirmatively intended that aliens be afforded all notice reasonably possible relating to their status.

Interpreting the term "arrest" in § 1326 to refer to the § 243.2 arrest furthers this Congressional purpose. The Warrant of Deportation notifies the alien that he has been finally and officially ordered deported. As a matter of administrative furtherance of this objective, the Warrant of Deportation is accompanied by INS Form I–294, which specifically informs the alien of the criminal penalties to which he may be subjected should he thereafter reenter the country without prior consent of the Attorney General.

■ On the other hand, the § 242.2 discretionary arrest has nothing to do in any way with a subsequent reentry after deportation. Its sole function is a security device to assure that the alien does not evaporate. Since it is a pre-hearing procedure, it does not advise the alien that he has been finally determined to be deportable (indeed, at that point he has not). Nor does it put the alien on notice that if he is thereafter deported criminal sanctions will attach to any reentry without permission. Moreover, to read the statute as permitting a § 242.2 arrest to make reentry criminally punishable, is to emasculate the statute and render its purpose obscure. There is simply no reason why Congress should impose criminal sanctions on illegal

ity contained in section 243 of the Act to determine at whose expense the alien shall be deported and whether his

mental or physical condition requires personal care and attendance en route to his destination."

reentry after deportation *only if* the District Director had, in his discretion, seen fit to arrest the alien before the deportation hearing, but not where the District Director had determined that a pre-hearing arrest was neither necessary nor desirable. There is simply no logical nexus between a pre-hearing arrest and the criminality of a subsequent illegal reentry. Therefore, we cannot attribute to Congress such a senseless effort.

Such a result is not only justified, but indeed compelled, by the facts of the present case. It is undisputed that when the defendant left the country on February 17 he believed that he was doing so pursuant to the privilege of voluntary departure. Therefore, when he reentered the country on February 19 without obtaining permission of the Attorney General he did not realize that he had previously been deported and that

permission of the Attorney General was consequently required. If a Warrant of Deportation (INS Form I–205) and the accompanying INS Form I–294 had been issued, there could be no doubt that the defendant had been fully informed as to the legal effect of his departure and the consequences of his reentry. Even if the alien had been "deported" by operation of 8 U.S.C.A. § 1101(g) [16] the issuance of a Warrant of Deportation, service of which constitutes an "arrest" as we understand that term,[17] would provide the requisite notice to trigger criminal sanctions for illegal reentry thereafter.

Apparently this interpretation of the term "arrest" is the one embraced by the INS, too. The two INS officials who testified at defendant's trial both opined that defendant was not "arrested" within the meaning of the statute.[18]

16. "For the purposes of this chapter any alien ordered deported (whether before or after the enactment of this chapter) who has left the United States, shall be considered to have been deported in pursuance of law, irrespective of the source from which the expenses of his transportation were defrayed or of the place to which he departed."
· The Government argues that this provision dispenses with the necessity of an arrest in a § 1326 prosecution. We cannot agree. At most the section provides a basis for holding that the defendant was deported (despite his more or less "voluntary" departure from the country,) but something more than deportation is required by the criminal statute. There must also have been an arrest.

17. The Warrant of Deportation commands the INS officer to "take into custody" the deportable alien. It is therefore analogous to an arrest warrant ordering a law enforcement officer to take a prisoner into custody. Once service has been had, an arrest has been consummated (for purposes of this statute) since thereafter the alien is continually subject to the restraints and orders of the District Director, and in "custody" even though physical surrender may be deferred for several days. The "custody" in such circumstances is similar to that of a parolee (cf. Jones v. Cunningham, 1962, 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed. 2d 285) or a military serviceman (cf.

Strait v. Laird, 1972, 40 U.S. 341, 92 S.Ct. 1693, 32 L.Ed.2d 141 [1972]). In each case the "custody" results from the restraint on liberty attendant upon being subject to the orders of another. The act which effectuates that result—in this case, service of the Warrant of Deportation—must be characterized as an "arrest."

18. Joseph A. Hession, the Supervisory Border Patrol Agent, testified:
Q Now, you have said that on that particular occasion you arrested the Defendant?
A That's correct.
Q Now, you don't mean there was a warrant of arrest for deportation issued at that point, do you?
A No, there was no warrant of arrest issued at that moment.
Q Is there not a special form used for that purpose?
A There is.
Q And isn't that form referred to as Form 1205?
A It is.
Q That is not the form that you are talking about?
A No, we are talking about 1213.
Q And it is not the arrest referred to in the statute for arrest and deportation?
A No, it was not.
\* \* \* \* \*
Neale S. Foster, the Assistant Director for Deportation, echoed this view:

The District Director of the INS twice expressed the view in letters to the United States Attorney that the defendant had not been arrested within the contemplation of the statute.[19] We agree. Although this is most unusual in the sense that the administrative interpretation of the law is expressed by low echelon persons they nevertheless merit consideration under the general principle that accords substantial significance to agency interpretation of its own regulations. See Udall v. Tallman, 1965, 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.

Ed.2d 616; Allen M. Campbell Co. v. Lloyd Wood Construction Co., 5 Cir., 1971, 446 F.2d 261, 265; Crowley v. Pierce, 5 Cir., 1972, 461 F.2d 614, 617 (Brown, C. J., concurring specially) [1972].

■ Accordingly, since there is no evidence that a warrant of arrest for deportation was issued or served, the Government failed to prove an element of the criminal offense. Defendant's motion for acquittal should have been granted.

Reversed.

> Q Are you familiar with the Statute which talks about "the arrest and deportation"?
> A Yes.
> Q All right. Was there such an arrest made under that Statute pursuant to that Order?
> A No.
>
> &ast; &ast; &ast; &ast; &ast;
>
> Q There was, therefore, then, not an arrest as specified under the Statute?
> A I did not arrest this man and deport him.
> THE COURT: Allright. Now, he said that a couple of times. Anything further.
> Q Was there anyone else in your Division or Department that arrested him?
> A Nosiree.

19. In the first letter to the United States Attorney the District Director explained,

> Secondly, the Defendant was accorded the privilege of departing voluntarily as a result of the deportation hearing and while he did effect his own deportation by leaving three days after its expiration, without first having secured an extension, it is my thought that this does not comply with the statute that the alien be *arrested* and deported before he can be prosecutable.

This position was amplified in the second letter:

> I have the authority to extend the voluntary departure date in a case such as this; however, there is no record of an extension being granted this alien. When an alien fails to depart voluntarily in accordance with an Order such as that issued in the Wong Kim Bo case, the following administrative actions are usually taken:
>
> 1. A warrant for the arrest and deportation of the alien is issued. A copy of Form I–205, used for that purpose, is attached.
> 2. Form I–294, Notice Of Country To Which Deportation Has Been Directed And Penalty For Reentry Without Permission is served on the alien either by certified mail or personal service. A copy of that form is attached.
> 3. Arrangements for deportation of the alien are made, and an alien who is not in Service custody is notified on Form I–166 (copy attached) advising him of the travel arrangements and when and where he is to surrender for deportation. Under 8 CFR 243.3, this notice must be given to him at least 72 hours prior to the time of surrender.
>
> Our previous experience has indicated that United States attorneys have been very reluctant to prosecute an alien for reentry after deportation unless there is evidence to establish that the alien was approximately warned of the criminal violation and penalty for reentering this Country without permission of the Attorney General.

## APPENDIX A

### UNITED STATES DEPARTMENT OF JUSTICE
Immigration and Naturalization Service

Please Refer To This File No.

Dear

This is a warning. Please read carefully.

It has been ordered that you be deported to _____. You will be informed when departure arrangements are complete. If needful, we will assist you as much as possible in arranging your personal affairs for departure.

Should you wish to return to the United States you must write this office or the American Consular Office nearest your residence abroad as to how to obtain permission to return after deportation. By law (Title 8 of United States Code, Section 1326) any deported person who returns without permission is guilty of a felony. If convicted he may be punished by imprisonment of not more than two years and/or a fine of not more than $1,000.00.

Please keep this letter and refer to the above file number when writing to this office.

Very truly yours,

Form I–294
(Rev. 6–1–70)N

See Appendix on next page.

## APPENDIX B

### UNITED STATES DEPARTMENT OF JUSTICE

⌐

⌐                                                          File No.

                                                              Date:

___                     ⌐

As you know, following a hearing in your case you were found deportable and the hearing officer has entered an order of deportation. A review of your file indicates there is no administrative relief which may be extended to you, and it is now incumbent upon this Service to enforce your departure from the United States.

Arrangements have been made for your departure to _____
                                                                                                          (country)
on _____ from _____ on the _____
        (date)                    (port of departure)

_____
(name of vessel, airline, or other transportation)
You should report to a United States Immigration Officer at Room
_____ _____ at _____ completely ready
    (No.)             (address)                        (hour and date)
for deportation. At the time of your departure from _____
                                                                                            (place of surrender)
you will be limited to _____ pounds of baggage. Should you have personal effects in excess of this amount you must immediately contact _____ at _____, or call in person at
        (name of officer)              (phone no. and ext.)
the address noted above, and appropriate disposition of your excess baggage will be discussed with you.

Very truly yours,

Form I–166
(Rev. 4–1–69)