**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 16 1998**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

    v.

HERTA WITTGENSTEIN, also
known as Herta Hilscher, also known
as Herta Christiensen,

        Defendant - Appellant.

No. 97-2379

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D. Ct. No. CR-97-242-JC)**

---

John V. Butcher, Assistant Federal Public Defender, Albuquerque, New Mexico,
for Defendant-Appellant.

Laura Fashing, Assistant United States Attorney (John J. Kelly, United States
Attorney, with her on the brief), Albuquerque, New Mexico, for Plaintiff-
Appellee.

---

Before **TACHA**, **BALDOCK**, and **KELLY**, Circuit Judges.

---

**TACHA**, Circuit Judge.

Defendant-Appellant Herta Wittgenstein appeals from her conviction of having been found in the United States without permission of the Attorney General after prior arrest and deportation in violation of 8 U.S.C. § 1326 (1994). We exercise jurisdiction under 28 U.S.C. § 1291 and affirm.

## Background

Ms. Wittgenstein, a native and citizen of Austria, has resided in the United States since August 13, 1964, when she entered as a non-immigrant visitor. For the bulk of these years, she has lived here illegally. Not until April 13, 1992, did an immigration judge grant her status as a "lawful permanent resident." Three years later, on April 19, 1995, the Immigration and Naturalization Service ("INS") issued an Order to Show Cause why Ms. Wittgenstein should not be deported as an "alien who at any time after entry is convicted of two or more crimes involving moral turpitude . . . ." 8 U.S.C. § 1251(a)(4) (1994). Ms. Wittgenstein had been convicted of a fraud involving more than $2500 and attempted tax evasion under New Mexico state law. See N.M. Stat. Ann. § 7-1-72; Wittgenstein v. INS, 124 F.3d 1244, 1246 (10th Cir. 1997). Shortly after an INS agent served Ms. Wittgenstein with the Order to Show Cause, she left the country, attempting to reenter the United States through Atlanta, Georgia, on May 16, 1995. At the Atlanta port of entry, an INS inspector noted that Ms. Wittgenstein was inadmissible into the United States. However, he "paroled" her

into the country for "deferred inspection" at the Albuquerque, New Mexico INS office. When she presented herself in Albuquerque, Agent Godshall affirmed that he wrote "admitted" on Ms. Wittgenstein's Form I-94 (Departure Record).

After Ms. Wittgenstein returned to the United States, the deportation hearing resumed, and on January 26, 1996, the immigration judge ordered Ms. Wittgenstein deported. The INS issued a Warrant of Deportation the same day. On February 5, 1996, Ms. Wittgenstein filed a motion for reconsideration. Under INS regulations, the motion did not stay her deportation.

On February 15, 1996, INS agents, along with a Santa Fe County deputy sheriff, went to Ms. Wittgenstein's home to execute the Warrant of Deportation. When she answered the door, an INS agent stepped inside, handcuffed her, told her he had a Warrant of Deportation for her arrest, and showed her the warrant. Ms. Wittgenstein protested that she had a motion pending before the immigration court and requested removal of the handcuffs so that she could call the judge. The INS agent obliged. Ultimately, Ms. Wittgenstein received a telephonic hearing before the immigration judge on her motion to reconsider. During the telephonic hearing, the immigration judge denied Ms. Wittgenstein's motion and shortly thereafter faxed her written decision to Ms. Wittgenstein's residence.

Ms. Wittgenstein requested permission to shower and change her clothes before the agents took her into custody. Again, the INS agents obliged.

- 3 -

Eventually, the INS agents no longer heard movement in the bedroom. They knocked on the door and received no response. After ascertaining that Ms. Wittgenstein was no longer in the bedroom, the agents searched the entire house for her to no avail. In one declaration, Ms. Wittgenstein maintained that she had hid in her bedroom closet until the agents left. In another affidavit, she claimed that she retreated to a room on the lower level until she felt calmer and to her "astonishment" the INS agents had left when she returned upstairs. The INS agents had no further contact with Ms. Wittgenstein until March 31, 1997, when they took her into custody for violating 8 U.S.C. § 1326 (1994).

Although the INS agents did not find Ms. Wittgenstein until the end of March 1997, they periodically attempted to locate her. In January 1997, responding to an inquiry by Albuquerque INS Special Agent Godshall, Atlanta INS Special Agent Holth investigated the possibility that defendant had flown from London, England to Atlanta, Georgia on January 25, 1997. The investigation revealed that an individual by the name of Herta Wittgenstein had made that flight and continued on to Albuquerque. No one with that name, however, had passed through United States Customs that day. Instead, someone using the name Herta Christiensen, with the same date of birth and nationality as Ms. Wittgenstein, and coming from the same flight, presented herself to Customs. Agent Holth relayed this information, as well as information that Ms.

Wittgenstein had lost something during the course of the flight that Delta Airlines later sent to her home in Sante Fe via Federal Express, to the INS office in Albuquerque on January 29, 1997.

On February 13, 1997, INS Special Agent Lee requested a search warrant for Ms. Wittgenstein's home in Sante Fe. The affidavit in support of the search warrant stated that Ms. Wittgenstein, a native and citizen of Austria, was illegally in the United States and that an agent of the New Mexico Attorney General's office had recently seen her in Sante Fe. Agent Lee also averred that he had passed her home and saw a Mercedes Benz registered to her parked at the residence. A United States Magistrate issued a warrant to search Ms. Wittgenstein's home for her and documents relating to her alienage or citizenship. Several INS agents and two Santa Fe Deputy Sheriffs executed the warrant on February 14, 1997. Although Ms. Wittgenstein was not at home, the officers seized several documents indicating that she had left the United States on December 23, 1997, and returned on January 25, 1997.

On March 31, 1997, in response to tip from a friend of Ms. Wittgenstein's, Sandoval County Deputy Sheriff Wiese arrested the defendant in Regina, New Mexico. Defendant requested that Deputy Wiese return to the house where the officers arrested her so that she could get her shoulder bag. Officer Wiese complied with this request. At the Cuba, New Mexico substation, Deputy Wiese

searched the bag for weapons, removing two pocket knives. When two INS agents arrived an hour later, Deputy Wiese gave them Ms. Wittgenstein's passport, pocket knives, and shoulder bag. The INS agents transported her to Albuquerque where they stowed her belongings in a storage locker. The following day, they conducted a search of the bag, seizing several documents pertinent to her travels outside the country from December 1996 to January 1997.

On April 16, 1997, a federal grand jury returned a one-count indictment against Ms. Wittgenstein charging her with violating 8 U.S.C. § 1326 because she was found in the United States without the permission of the Attorney General after having been previously deported. After a two-day trial, a jury convicted Ms. Wittgenstein on August 5, 1997. The court sentenced her to eighteen months in prison followed by three years supervised release and imposed a $30,000 fine.

On appeal, Ms. Wittgenstein argues that the district court (1) erred in instructing the jury regarding the arrest element of 8 U.S.C. § 1326 and therefore erred in denying her motion for acquittal; (2) erred in denying her motion to dismiss in which she claimed that the immigration judge lacked jurisdiction to issue the deportation order against her and failed to properly advise her of her right to appeal; (3) erred in denying her motion to suppress evidence seized during a search of her residence and a later search of her shoulder bag at the time of her arrest; (4) erred in admitting evidence of prior bad acts; (5) erred in

instructing the jury that it should consider prior sworn testimony of Agent Lee for impeachment purposes only; and (6) erred in imposing a $30,000 fine.

## Discussion

### I.

To find a defendant guilty of violating 8 U.S.C. § 1326 (1994), the government must prove beyond a reasonable doubt that defendant was an alien who had been arrested, deported, and thereafter found in the United States without the Attorney General's consent for readmission. See 8 U.S.C. § 1326 (1994); United States v. Martinez-Moral, 118 F.3d 710, 712-13 (10th Cir. 1997). Ms. Wittgenstein argues that the district court, over defense objections, erroneously instructed the jury as to the meaning of the arrest element. She asserts that this violated her Fifth and Sixth Amendment rights and thus constitutes reversible error. Her argument presents two pertinent issues: whether the instruction given was legally incorrect; and if so, whether it constitutes harmless error.

After instructing the jury regarding the elements the government must prove, including the arrest element, the district court stated that "[t]he issuance of a Warrant of Deportation by the Immigration and Naturalization Service is a sufficient restraint on liberty to constitute an arrest, even without custodial manhandling or physical restraint." Jury Instruction 8c. Ms. Wittgenstein argues

that the mere issuance of a warrant does not provide notice, and therefore cannot constitute an arrest. "We review the jury instructions de novo to determine whether, as a whole, the instructions correctly state the governing law and provide the jury with an ample understanding of the issues and applicable standards." United States v. Cecil, 96 F.3d 1344, 1347 (10th Cir. 1996), cert. denied, 117 S. Ct. 987 (1997); see also Okland Oil Co. v. Conoco Inc., 144 F.3d 1308, 1324 (10th Cir. 1998).

In this case, the district court judge relied on the only Tenth Circuit case to address the arrest element of 8 U.S.C. § 1326, United States v. Hernandez, 693 F.2d 996 (10th Cir. 1982). In Hernandez, this court declared, "INS . . . issued a Warrant of Deportation under § 243.2. . . . 'That is sufficient restraint on liberty to constitute an 'arrest,' even without custodial manhandling and physical restraint . . . .'" 693 F.2d at 998 (citation omitted). Thus, an isolated read of the Hernandez opinion supports the accuracy of the district court's jury instruction. However, when Hernandez is read in light of the developed case law of the Fifth and Ninth Circuit, which it implicitly incorporated, a different conclusion is reached. See id. (citing United States v. Wong Kim Bo, 472 F.2d 720, 722 (5th Cir. 1972) (Wong Kim Bo II), and United States v. Farias-Arroyo, 528 F.2d 904, 905 (9th Cir. 1975)). Therefore, we find that the district court understated the

legal standard for finding an arrest under 8 U.S.C. § 1326. [1]

The seminal case pertaining to the meaning of "arrest" in the context of immigration cases, United States v. Wong Kim Bo, 466 F.2d 1298 (5th Cir. 1972), and its progeny reveal that the arrest element's primary concern is procedural fairness, and that the hallmark inquiry under the arrest element is whether the defendant had knowledge or notice of a final deportation order. See United States v. Bahena-Cardenas, 70 F.3d 1071, 1073 (9th Cir. 1995) (asserting that "[w]ithout notice, there can be no arrest, and no restraint on the liberty that an arrest connotes"); United States v. Quezada, 754 F.2d 1190, 1192 (5th Cir. 1985) ("[N]otice is critical . . . for it insures that criminal sanctions are not imposed for reentry where the alien does not know that he has previously been officially deported."). For example, in Wong Kim Bo, the Fifth Circuit declared:

> Congress might understandably hesitate to impose criminal sanctions for reentry where the alien does not know or realize that he has been officially ordered deported. The arrest of an alien *after* an order of deportation has become final provides great assurance that the alien understands that he is being officially deported.

466 F.2d at 1304 (emphasis in original).

Ms. Wittgenstein argues that the INS never properly served her with a valid

---

[1] On September 30, 1996, Congress amended 8 U.S.C. § 1326 and omitted the arrest element. See 8 U.S.C. § 1326(a) (Supp. 1996). With certain exceptions and subject to certain transitional rules inapplicable here, the amendment did not take effect until April 1, 1997. See Berehe v. INS, 114 F.3d 159, 161 (10th Cir. 1997). The government charged Ms. Wittgenstein with violation of 8 U.S.C. § 1326 on March 31, 1997, and therefore, does not benefit from the amendment.

Warrant of Deportation and, thus, never arrested her within the meaning of the statute. While it is true that the courts in Wong Kim Bo, Bahena-Cardenas, and Quezada found that each defendant had been served with a Warrant of Deportation and therefore arrested, these opinions do not stand for the proposition that service is necessary where actual knowledge of a final deportation order exists. In fact, in each of those cases, as noted above, the court indicated that notice constituted the primary concern of the arrest element. Service merely provided the most ready proof that the defendants had notice that a final deportation order had issued against them. Thus, properly read, these cases support the proposition that a defendant is arrested under 8 U.S.C. § 1326 as soon as he or she knows or receives notice that a final deportation order has issued against him or her.

Consequently, we find that the district court's jury instructions erroneously understated the legal standard for arrest under 8 U.S.C. § 1326. The instruction should have stated that knowledge or notice of a final deportation order, whether by service of a Warrant for Deportation or otherwise, provides a sufficient restraint on liberty to constitute an arrest, even without custodial manhandling or physical restraint.

Having found that the district court misstated the arrest element of an 8 U.S.C. § 1326 offense, we must assess whether the instruction nevertheless

constitutes harmless error. This court will reverse for instructional error only where it is "prejudicial in view of the entire record." United States v. Cecil, 96 F.3d 1344, 1347 (10th Cir. 1996), cert. denied, 117 S. Ct. 987 (1997). In other words, on a direct criminal appeal, we generally disregard those errors that do not affect a substantial right. See Fed. R. Crim. P. 52(a). Here, Ms. Wittgenstein argues that the erroneous jury instruction violated her Fifth and Sixth Amendment rights to a jury determination of guilt beyond a reasonable doubt as to every element of her offense. Under Rule 52(a), the government bears the burden of proving lack of prejudice. See United States v. Olano, 507 U.S. 725, 734 (1993).

Ms. Wittgenstein correctly asserts that the Fifth and Sixth Amendment entitle those accused of serious crimes to an actual jury verdict of guilty beyond a reasonable doubt as to every element of the charged crime. See Sullivan v. Louisiana, 508 U.S. 275, 278-80 (1993). However, no constitutional violation presents itself in this case. A review of the record indicates that we may properly find harmless error without running afoul of Fifth and Sixth Amendment concerns.

The right to a jury trial as to every element of an offense may be waived when a defendant admits an essential element, cf. Connecticut v. Johnson, 460 U.S. 73, 87 (1983) (finding jury instruction error in state trial involving an essential element of crime properly considered harmless and not violative of the

Fourteenth Amendment Due Process Clause when defendant conceded the existence of the element), or has stipulated to facts establishing the essential element, see United States v. Mason, 85 F.3d 471, 472 (10th Cir. 1996). In such cases, an erroneous jury instruction relating to the admitted or stipulated element may constitute harmless error without implicating the Fifth and Sixth Amendments. Ms. Wittgenstein admitted on several occasions that she knew the immigration judge had issued a final order of deportation against her and that the INS had issued a Warrant for Deportation. For example, during the telephonic hearing conducted while INS agents were in her home on February 15, 1996, Ms. Wittgenstein stated that the INS agent "has a warrant of deportation signed (coughing), I'm sorry -- signed by District Director in El Paso on January 26." Appellee's Supp. App. at 6. She also stated in a written declaration to the INS:

> [O]n a recent morning two Immigration Agents appeared at the door. "Get your passport and pack a small bag" they said, "we're going to take you now to a detention facility in Texas and from there you'll be deported within 72 hours."

> Not willing to abandon everything I've worked so hard on at a moment's notice, . . . I decided to take the law into my own hands and pursue due process. A closet in the house which had sheltered the children and me became a refuge until the agents left . . . .

Id. at 8. Moreover, in a sworn affidavit, Ms. Wittgenstein admitted that INS officers told her on February 15, 1996, when they arrived at her house to take her into custody, that she was to be deported and showed her a Warrant for

- 12 -

Deportation. Most telling, Ms. Wittgenstein further admits in her affidavit that the immigration judge denied her Motion to Reopen as well as her Request for a Stay. In fact, she even admits receiving Judge Smith's written decision via fax later that morning while the INS agents were still in her home. Although these various statements diverge on a few details such as whether the warrant was signed and where and whether she hid from the INS agents, nothing contradicts her ultimate admissions of knowledge of the final deportation order. In sum, Ms. Wittgenstein admitted having actual notice of the deportation order, thereby satisfying the arrest element of 8 U.S.C. § 1326. As a result, she has waived her right to a jury trial with respect to that element. We therefore conclude that the district court's erroneous jury instruction regarding the arrest element constituted harmless error and does not warrant reversal.

II.

At trial, Ms. Wittgenstein moved to dismiss, arguing that the immigration court violated her right to due process because it lacked jurisdiction to enter the deportation order and failed to properly advise her of her right to appeal. She asserts the district court erroneously denied this motion. Whether the district court erred in failing to dismiss the indictment due to alleged violations of due process in the underlying immigration proceedings is a mixed question of law and fact that we review de novo. See United States v. Aranda-Hernandez, 95 F.3d

977, 980 (10th Cir. 1996); cert. denied , 117 S. Ct. 1314 (1997); United States v.

Meraz-Valeta , 26 F.3d 992, 997 (10th Cir. 1994).

To collaterally challenge an order of deportation in a prosecution under 8

U.S.C. § 1326, the defendant must prove that:

> (1) the alien exhausted any administrative remedies that may have
> been available to seek relief against the order;
>
> (2) the deportation proceedings at which the order was issued
> improperly deprived the alien of the opportunity for judicial review;
> and
>
> (3) the entry of the order was fundamentally unfair.

8 U.S.C. § 1326(d) (Supp. 1996) (emphasis added). [2] This section comports with

the constitutional standard for due process set forth in United States v. Mendoza-

Lopez , 481 U.S. 828, 837-39 (1987). As the Tenth Circuit has cogently stated:

> A defendant may collaterally challenge a deportation hearing in a 8
> U.S.C. § 1326 prosecution if the defendant can show that the
> deportation hearing was fundamentally unfair and deprived the alien
> to the right of judicial review. In order to establish fundamental
> unfairness, the alien must show that he was prejudiced.

Meraz-Valeta , 26 F.3d at 998 (citation omitted) (emphasis added); see also

Aranda-Hernandez , 95 F.3d at 980. In this case, the government does not dispute

that Ms. Wittgenstein had exhausted all administrative remedies available to her.

Thus, our analysis concerning the appropriateness of her collateral attack on the

---

[2] 8 U.S.C. § 1326(d) applies to criminal proceedings, like this case, initiated after April 24, 1996.

underlying deportation order is the same whether we conduct a statutory or constitutional analysis.

To prevail, Ms. Wittgenstein must prove both that the deportation hearing deprived her of her right to judicial review and was fundamentally unfair. She can do neither. First, this court heard the merits of her appeal and affirmed the immigration judge's issuance of a deportation order. See Wittgenstein v. INS, 124 F.3d 1244, 1245 (10th Cir. 1997). Thus, she certainly cannot show that the deportation proceedings deprived her of her right to judicial review.

Additionally, Ms. Wittgenstein cannot show that the deportation hearing was fundamentally unfair. In attempting to establish fundamental unfairness, she first argues that the immigration judge lacked jurisdiction to order her deported. Essentially, she asserts that because she left the country after the deportation hearings began, the immigration judge lost jurisdiction to order her deported. She argues that when she returned to the United States in May 1995, the INS merely "paroled" her into the country, never properly "admitting" her. Thus, she claims that the immigration court could only determine her admissibility and legal status in an exclusion hearing. We need not address this issue because no prejudice resulted from the immigration judge entering a deportation order against her

rather than excluding her. [3]

Ms. Wittgenstein admits that she would have been properly excluded from the United States had exclusion rather than deportation proceedings occurred. Regardless of whether Ms. Wittgenstein was deported or excluded, reentering the United States without having obtained the permission of the Attorney General is a violation of 8 U.S.C. § 1326. The only difference Ms. Wittgenstein can point to in this case between exclusion and deportation is that one who is excluded can apply for readmission into the United States after one year, while those who are deported must wait five. In this case, however, Ms. Wittgenstein reentered the country just one month after deportation and did not apply for readmission at all. Thus, no prejudice resulted from deporting Ms. Wittgenstein instead of excluding her.

Ms. Wittgenstein further argues that fundamental unfairness resulted from her deportation hearings because the immigration judge unconstitutionally failed to fully advise her as to her right to appeal. The record, however, belies this contention. In a colloquy encompassing six pages of the deportation hearing transcript, the immigration judge advised Ms. Wittgenstein of her right to appeal

---

[3] In 1996, Congress amended the Immigration and Nationality Act and made the determination of whether an alien is admissible or deportable part of a single process called a removal proceeding. See 8 U.S.C. § 1229a (Supp. 1996). Because this amendment did not take effect until April 1, 1997, it does not affect this case.

and the procedures for doing so. At one point, the judge stated, "Should you not file an appeal, or should you file an appeal and your appeal be dismissed, the decision of the Court will become administratively final. The Immigration Service can then require that you submit yourself for deportation; report for deportation." Deportation Hearing Tr. at 613. Towards the end of the discussion, Ms. Wittgenstein demonstrated her knowledge of the time frame in which she had to file notice of her appeal. She stated, "If I understood you correctly, I have to file the notice of appeal by February 5th." Id. at 618. The judge responded affirmatively and gave her the opportunity to ask additional questions regarding the appeal procedure. Thus, the immigration judge properly apprized Ms. Wittgenstein of her right to appeal. We find that no fundamental unfairness resulted from the deportation hearing.

III.

Ms. Wittgenstein also claims that the district court erred in failing to grant her motion to suppress evidence seized during a search of her residence. She argues that the underlying affidavit lacked any basis for the magistrate to conclude that probable cause existed. We disagree.

In determining whether an affidavit contains sufficient information to support a finding of probable cause for the issuance of a search warrant, this court, like the issuing judge or magistrate, must consider the totality of the

circumstances and determine whether the affidavit established the probability that evidence of criminal activity would be located in the desired search area. See, e.g., Lawmaster v. Ward, 125 F.3d 1341, 1348 (10th Cir. 1997); United States v. Janus Indus., 48 F.3d 1548, 1552 (10th Cir. 1995). We grant the magistrate's determination of probable cause "'great deference' such that we ask only whether the issuing magistrate had a 'substantial basis' for determining probable cause existed." Lawmaster, 125 F.3d at 1348; accord Illinois v. Gates, 462 U.S. 213, 236 (1983); United States v. Glover, 104 F.3d 1570, 1577 (10th Cir. 1997).

The magistrate in this case issued a warrant to search 4 West Wildflower, Sante Fe, New Mexico for Ms. Wittgenstein and any documents relating to her alienage or citizenship. Based upon our review of the affidavit in support of the search warrant, we conclude that, when read as a whole, it stated facts sufficient to support the magistrate's determination of probable cause. The affidavit stated that a Special Agent of the New Mexico Attorney General's office had recently seen Ms. Wittgenstein, whom he knew because he had arrested her in the past, in Sante Fe. Furthermore, the affidavit stated that on February 12, 1997, the affiant, INS Special Agent Lee, observed a vehicle registered to Ms. Wittgenstein parked in front of the residence. Finally, the affidavit also stated that Ms. Wittgenstein had listed the 4 West Wildflower house as her address since 1986. Accordingly, we affirm the district court's refusal to grant Ms. Wittgenstein's motion to

- 18 -

suppress the evidence obtained by the February 14, 1997, search of her home.

Ms. Wittgenstein further argues that the district court erred in denying her motion to suppress evidence obtained through a search of her shoulder bag after her arrest. The documents seized from her shoulder bag are similar to those seized during the search of her residence, both sets providing evidence that she traveled outside the United States and reentered the country in January 1997. Ms. Wittgenstein acknowledges that any error in admitting the evidence from one source would constitute harmless error unless the court should have suppressed evidence from both sources. Because we have upheld the search of her home, we need not confront the constitutionality of the shoulder bag search.

IV.

Ms. Wittgenstein additionally argues that the court violated Federal Rules of Evidence 404(b) and 403 by admitting testimony of Marybeth Boissonnault that Ms. Wittgenstein had cheated her in a car purchase transaction. Ms. Boissonnault was a former friend to Ms. Wittgenstein and witness for the government. We review the admission of evidence at trial for abuse of discretion. See, e.g. , United States v. Segien , 114 F.3d 1014, 1022 (10th Cir. 1997), cert. denied , 118 S. Ct. 1310 (1998); United States v. Wilson , 107 F.3d 774, 780 (10th Cir. 1997). However, even if the trial court erroneously admits evidence, such error does not require reversal if it was harmless. See Wilson , 107 F.3d at 785.

Ms. Wittgenstein concedes that even if the trial court abused its discretion in admitting this testimony, it constitutes harmless error unless we reverse the district court's denial of both suppression motions discussed above. Because we upheld the search of Ms. Wittgenstein's residence and refused to reach the merits of the shoulder bag search, we deny relief on this claim.

V.

Ms. Wittgenstein next argues that the trial court committed reversible error when it limited the jury's consideration of prior inconsistent statements to impeachment purposes only. She claims that Agent Lee's testimony regarding whether he "arrested" Ms. Wittgenstein on February 15, 1997, changed from the time of his pretrial testimony because the government's attorney informed him that "arrest" was an essential element of an 8 U.S.C. § 1326 violation. Although under Federal Rule of Evidence 801(d)(1)(a), prior inconsistent testimony given under oath is admissible as substantive evidence, we find no reversible error. Some dispute exists as to whether Agent Lee's testimony was actually inconsistent. However, even if it were, Ms. Wittgenstein suffered no prejudice as a result of the district court's instruction. Given our above analysis and conclusion regarding the meaning of "arrest" under 8 U.S.C. § 1326, we find that even if the district court's instruction constituted error, it was harmless.

## VI.

Finally, Ms. Wittgenstein disputes the imposition of her $30,000 fine. We review the district court's imposition of a fine within the range set by the Sentencing Guidelines for abuse of discretion. See United States v. Meuli, 8 F.3d 1481, 1487 (10th Cir. 1993); United States v. Washington-Williams, 945 F.2d 325, 326 (10th Cir. 1991). We accept the district court's findings of fact relating to the defendant's ability to pay a fine unless clearly erroneous. See Washington-Williams, 945 F.2d at 326. After reviewing the record, we find no clear error in the district court's factual findings and hold that the district court did not abuse its discretion in levying this fine against Ms. Wittgenstein.

## **Conclusion**

Based upon the foregoing analysis and conclusions, we find that the district court committed no reversible error. Therefore, we AFFIRM the conviction of Ms. Wittgenstein under 8 U.S.C. § 1326.

No. 97-2379, *United States v. Herta Wittgenstein*.

**KELLY**, Circuit Judge, dissenting.

The court holds that the arrest element of former 18 U.S.C. § 1326 is satisfied by knowledge or notice of a deportation order, and that Ms. Wittgenstein "waived her right to a jury trial with respect to that element" based upon her statements showing that she was aware of the order.  See Ct. Op. at 13.  Because service of a warrant of deportation is essential for an arrest (not merely notice of a final deportation order), and because "[t]he Constitution gives a criminal defendant the right to demand that a jury find him guilty of all of the elements of the crime with which he is charged," United States v. Gaudin, 515 U.S. 506, 511 (1995), I respectfully dissent.

A.

A legally incorrect instruction constitutes error.  See United States v. Olano, 507 U.S. 725, 732-33 (1993).  While I agree with the court that the district court's instruction understated the legal standard for arrest, so too does the court's formulation.  While the court acknowledges that all of the cases it relies upon for the meaning of "arrest" involve service of a warrant of deportation, it still concludes that "these opinions do not stand for the proposition that service is necessary where actual knowledge of a final deportation order exists."  Ct. Op. at 10.  The cases plainly require service of a warrant of deportation and do not hold it may dispensed with upon actual knowledge of a final order of deportation, let

alone the warrant.  See United States v. Bahena-Cardenas, 70 F.3d 1071, 1073-74 (9th Cir. 1995) ("We are not aware of any case holding that an alien who was not served with the warrant was 'arrested' under the statute.  We agree with the Fifth Circuit and hold that the term 'arrested' in 8 U.S.C. § 1326 requires that a warrant of deportation be served on the alien."); United States v. Quezada, 754 F.2d 1190, 1192 (5th Cir. 1985) ([A]n 'arrest' under the statute is accomplished by service on the alien of the warrant of deportation, thus providing the requisite notice to trigger criminal sanctions for illegal reentry thereafter."); United States v. Wong Kim Bo, 466 F.2d 1298, 1306 (5th Cir. 1972) ("Accordingly, since there is no evidence that a warrant of arrest for deportation was issued or served, the Government failed to prove an element of the criminal offense.").

To equate an arrest with mere knowledge or notice of a final deportation order is to ignore that an arrest is accomplished by a warrant of deportation and service.  See Bahena- Cardenas, 70 F.3d at 1073 (warrant of deportation must be issued and served).  Although the court recognizes that service of a warrant of deportation may give knowledge or notice of a final deportation order, the court's formulation dispenses with an element of the statute (arrest pursuant to a warrant) in favor of one of the purposes of an arrest (notice or knowledge of an order of deportation).  I would suggest that an element contained in the statute may not be disregarded merely because one purpose of the element may have been fulfilled

by some other means.  Otherwise, the meaning of a statute would vary from one expositor to another and policy would eclipse statute.

The seminal case discussed "service [of a warrant of deportation] of which constitutes an 'arrest' as we understand the term[:]"

> Once service has been had, an arrest has been consummated (for purposes of this statute) since thereafter the alien is continually subject to the restraints and orders of the District Director, and in "custody" even though physical surrender may be deferred for several days. . . . [This] "custody" results from the restraint on liberty attendant upon being subject to the orders of another.  The act which effectuates that result—in this case, service of the Warrant of Deportation—must be characterized as an "arrest."

Wong Kim Bo, 466 F.2d at 1308 n.17.  No case has been cited upholding a § 1326 conviction where the defendant had not been served with the warrant of deportation, i.e. arrested.  See, e.g., Bahena-Cardenas, 70 F.3d at 1073-74 (reversing conviction where defendant was not served); Quezada, 754 F.2d at 1194 ("We further believe that the warrant of deportation in this case establishes the service required by Wong Kim Bo.  Appellant's thumbprint on the warrant indicates that the warrant was presented to him prior to departure."); United States v. Hernandez, 693 F.2d 996, 998 (10th Cir. 1982) (signature of defendant appeared on reverse side of three of four warrants and INS agent testified that he was the arresting officer each time).  Holding that the arrest element could be satisfied on mere notice of an order of deportation, or even the issuance of a warrant of deportation, "would eliminate the arrest element altogether."  Bahena-

Cardenas, 70 F.3d at 1073.

B.

The court compounds the problem by determining that the erroneous jury instruction was harmless error. According to the court, the evidence that Ms. Wittgenstein had actual knowledge or notice of the final deportation order constitutes an admission of the "arrest" element, and therefore, she has waived her right to a jury trial on that element. Ct. Op. at 13.

As background, the court's approach goes far beyond deciding the correct law that applies to the evidence and into the realm of applying that law to the facts. Of course, only the jury is empowered to do the latter.

> After the government has presented its evidence as to each element, and the defendant has had the opportunity to present a defense, if the defendant so chooses, the judge must [correctly] instruct the jury on the law applicable to the issues raised at trial. See United States v. Whitehorse, 807 F.2d 1426, 1430 (8th Cir. 1986). Under Sixth Amendment jurisprudence, the next two steps are strictly for the jury: (1) determining the facts as to each element of the crime, and (2) applying the law as instructed by the judge to those facts.

United States v. Johnson, 71 F.3d 139, 143 (4th Cir. 1995).

In a direct criminal appeal, error committed over objection is generally reviewed under Fed. R. Crim. P. 52(a). Because Ms. Wittgenstein posed a timely objection, the government bears the burden of proving a lack of prejudice in this direct criminal appeal. See Olano, 507 U.S. at 734. The Supreme Court and this court have described rare situations where an elemental instructional error may be

-4-

harmless. One, of course, is where the defendant was ultimately acquitted of the relevant charge, and other charges were unaffected. See Connecticut v. Johnson, 460 U.S. 73, 87 (1983) (plurality opinion). In addition, because the right to jury trial may be waived, others are where a defendant admitted the essential element, see id., or stipulated to facts establishing (not merely tending to establish) the essential element, see United States v. Mason, 85 F.3d 471, 472 (10th Cir. 1996).

Here, Ms. Wittgenstein did not admit the arrest element, nor did she stipulate to facts establishing it. Quite the contrary, the evidence at trial put this element in dispute and she vigorously contended throughout the proceedings that she was never arrested within the meaning of the statute. See I R. doc. 30 at 22-23 (Motion to Dismiss and Memorandum in Support) ("Herta Wittgenstein has not been arrested within the meaning of 8 U.S.C. § 1326(a)."); I. R. doc. 33, Instruction No. K (Defendant's Requested Jury Instructions); I. R. doc. 73; IX R. at 288 (Motion for Judgment of Acquittal at close of prosecution's case-in-chief); IX at 329 (Motion for Judgment of Acquittal at close of all of the evidence); IX R. 325-26, 360-61 (objections to court's jury instructions); IX R. 352 (government's closing argument stating issuance of the warrant of deportation was all that was required, notwithstanding Ms. Wittgenstein's argument that she was never arrested).

The government makes but one argument in its effort to carry its burden:

-5-

that its presentation of overwhelming evidence of service and notice at trial renders the erroneous instruction harmless. The government relies upon language of the Supreme Court stating that "[w]here a reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt, the interest in fairness has been satisfied and the judgment should be affirmed." Rose v. Clark, 478 U.S. 570, 579 (1986). This approach, however, was unanimously debunked in Yates v. Evatt, 500 U.S. 391, 402-03 n.8. (1991). It offends a defendant's Fifth and Sixth Amendment rights to a jury determination of guilt beyond a reasonable doubt as to every element of the crime charged. See Sullivan v. Louisiana, 508 U.S. 275, 278 (1993); see also Yates, 500 U.S. at 407 (reversing because state court's analysis of record evidence left it unclear whether jury verdict "did rest on that evidence").

The Sixth Amendment embodies "a profound judgment about the way in which law should be enforced and justice administered." Duncan v. Louisiana, 391 U.S. 145, 155 (1968). The jury right "was designed to guard against a spirit of oppression and tyranny on the part of rulers, and was from very early times insisted on by our ancestors in the parent country, as the great bulwark of their civil and political liberties." Gaudin, 515 U.S. at 510-11 (internal quotation marks and citation omitted). To these ends, the Sixth Amendment entitles those accused of serious crimes to more than a hypothetical jury verdict, it entitles them

-6-

to an actual jury verdict. See Sullivan, 508 U.S. at 280. If not actual in form, a verdict must at least be actual in fact. See United States v. Holland, 116 F.3d 1353, 1357 n.3. (10th Cir.), cert. denied, 118 S. Ct. 253 (1997), overruled on other grounds, Bousley v. United States, 118 S. Ct. 1604 (1998).

To determine whether a jury verdict was actual in fact, courts must initially determine the scope of the record in the context of which the erroneous instruction's affect is to be assessed. See Yates, 500 U.S. at 404; see also Sullivan, 508 U.S. at 279. The scope of the record considered must be determined by review of the set of instructions the jury was given, consistent with the customary rule that juries are presumed to have followed their instructions. See Yates, 500 U.S. at 403-04; Richardson v. Marsh, 481 U.S. 200, 211 (1987). To blindly assume the jury considered all of the evidence would fail to ensure that a judgment of harmlessness is made in a manner that preserves a defendant's right to jury trial. See Yates, 500 U.S. at 405-06. Reviewing courts would engage in a prohibited subjective inquiry into jurors' minds, weighing all of the evidence and necessarily speculating as to whether a jury, if it considered that evidence, would have found guilt beyond a reasonable doubt. See id. at 404-06.

Accordingly, the Supreme Court has repeatedly held that even overwhelming evidence cannot constitutionally substitute for an actual jury finding, whether formal or effective, on an essential element of a serious crime.

-7-

See Sullivan, 508 U.S. at 279-80; United States v. Martin Linen Supply Co., 430 U.S. 564, 572-73 (1977); United Bhd. of Carpenters & Joiners v. United States, 330 U.S. 395, 408 (1947); Bollenbach v. United States, 326 U.S. 607, 614 (1946); see also Cabana v. Bullock, 474 U.S. 376, 384-85 (1986). "[T]he question is not whether guilt may be spelt out of a record," Bollenbach, 326 U.S. at 614, but whether the verdict "actually rendered" was unaffected by the erroneous instruction, Sullivan, 508 U.S. at 279; see Yates, 500 U.S. at 404. If the rule were different, the "wrong entity" could determine guilt, and directed verdicts for the government might as well be permitted. See Rose, 478 U.S. at 578; Sparf v. United States, 156 U.S. 51, 105-06 (1895).

Once the scope of the record is determined, Justice Scalia's concurring opinion in California v. Roy provides guidance in an assessment of whether a misdescribed element was nevertheless found beyond a reasonable doubt, so that the misdescription was harmless. The Court in that case was also concerned with "an error in the instruction that defined the crime." California v. Roy, 117 S. Ct. 337, 339 (1996). Justice Scalia explained that "[t]he error in the present case can be harmless only if the jury verdict on other points effectively embraces this one or if it is impossible, upon the evidence, to have found what the verdict did find without finding this point as well." Id. at 339-40 (Scalia, J., concurring) (emphasis in original) (quoted with approval in Holland, 116 F.3d at 1357).

This approach is consistent with this circuit's § 924(c) "use or carry" cases. In those cases, where jury instructions on "use" were faulty after United States v. Bailey, 116 S. Ct. 501 (1995), the court did not uphold convictions based on overwhelming evidence of "use," notwithstanding the faulty instructions. See, e.g., Holland, 116 F.3d at 1357 (declining to base decision on government's argument). Rather, convictions were affirmed based on other instructions given and the resultant jury consideration of evidence bearing on "carrying," and necessary jury findings of "carrying," an explicit alternative element under the statute. See, e.g., id. at 1359. Convictions were not upheld based on hypothetical jury verdicts, but actual jury verdicts, effective in fact if not in form. See United States v. McDonald, 150 F.3d 1301, 1304-05 (10th Cir. 1998); United States v. Durham, 139 F.2d 1325, 1335-36 (10th Cir.), cert. denied, 119 S. Ct. 158 (1998).

The government makes no argument that the instruction at issue, or any other instruction given, indicates the jury considered any evidence of service, much less necessarily found service beyond a reasonable doubt. I can find none, nor can I find any evidence that the jury considered whether Ms. Wittgenstein had knowledge of a final order of deportation under the court's incorrect formulation. Rather, the erroneous district court instruction, like a narrow conclusive presumption, indicates that a jury would not have considered other evidence bearing on an arrest, or notice of a final order of deportation under the court's

-9-

incorrect formulation.  See Yates, 500 U.S. at 403-04; Johnson, 460 U.S. at 85-86; Carella v. California, 491 U.S. 263, 269 (1989) (Scalia, J., concurring).  The challenged instruction told the jury that the mere issuance of a warrant constitutes arrest, and issuance was undisputed.  Thus, presuming jurors follow their instructions, it would have been a waste of the jurors' time to consider any other evidence of notice, service, or arrest generally.  See Sandstrom v. Montana, 442 U.S. 510, 526 n.13 (1979).  Likewise then, neither the challenged instruction, nor any other instruction, indicates a necessary jury finding either embracing service or making it impossible to not also have found service.  The government, therefore, has not demonstrated a means to say the jury verdict "actually rendered" on the instructions given was unaffected by the error, only that a jury verdict hypothetically could have been rendered on all of the evidence.  Sullivan, 508 U.S. at 279.  This case does not present a Griffin situation because the jury instructions did not provide the jurors any independent alternative ground for finding an arrest.  See Griffin v. United States, 502 U.S. 46 (1991).  Instead, the challenged instruction stated that issuance "constitute[d]" arrest.  I R. doc. 75.

As part of its argument, the government quotes the Supreme Court in Pope v. Illinois, 481 U.S. 497, 503 (1987), in which it stated, "While it was error to instruct the juries to use a state community standard in considering the value question, if a reviewing court concludes that no rational juror, if properly

instructed, could find value in the magazines, the convictions should stand." The government quotes Pope out of context. In that case, the Court held that an instruction directing the use of a community standard in judging the value of allegedly obscene material rather than a reasonable person standard was potentially harmless error. See id. at 498-99, 501-02. First, a jury considering whether the material lacked value under a community standard would consider the same evidence under a reasonable person standard. See id. at 503. Second, the error in Pope would have been harmless if no rational juror who found a lack of value under a community standard (which the jury in Pope did find) possibly could have found value under a reasonable person standard. See id. at 503 & 504 (Scalia, J., concurring).

In this case, however, a jury instructed that mere issuance of a warrant constitutes arrest would not necessarily consider the same evidence of arrest as a jury instructed that service is required. Indeed, the government told the jury that it need not consider any other evidence than issuance of the warrant of deportation.[1] Furthermore, it not possible to say that no rational juror who found

_____

[1]     The government stated:

> [Defense counsel] has spent a lot of time talking about what it means to be taken into custody and arrested, and preserving Ms. Wittgenstein's right to appeal. And I want to make it plain to you what the instruction was that the Court gave. The issuance of a warrant of deportation by the Immigration and

-11-

issuance of a warrant (or notice of a final order of deportation under the court's formulation) possibly could fail to also find service. Issuance and service are dissimilar and unrelated. Thus, "[t]here is no way of knowing here whether the jury's verdict was based on facts within the condemned instructions," or based on notice <u>and</u> service. <u>United Bhd. of Carpenters & Joiners</u>, 330 U.S. at 408.

Based on the foregoing, the error in this case was not harmless. Contrary to the government's position and that of the court, <u>see</u> Ct. Op. at 10 (stating that Ms. Wittgenstein has "waived" her right to a jury trial on the arrest element because she admitted to actual notice of the final deportation order), Ms. Wittgenstein is entitled to an actual jury finding, either formal or effective, on each essential element irrespective of even overwhelming evidence against her. <u>See</u> <u>Mason</u>, 85 F.3d at 472 (trial court may not "remove[] the consideration of an issue based upon the strength or similarity of the government's evidence"). To consider misdescription of an essential element harmless based on a judge's assessment of overwhelming evidence alone "would give too much weight to

> Naturalization Service is sufficient restraint on liberty to constitute an arrest, even without custodial manhandling or physical restraint.

> The Government's Exhibit 2, the issuance of the warrant of deportation. This by itself constitutes an arrest.

IX R. 352.

-12-

society's interest in punishing the guilty and too little weight to the method by which decisions of guilt are to be made." <u>Johnson</u>, 460 U.S. at 86. I would reverse and remand for a new trial.