STEPHEN H. ANDERSON, Circuit Judge,
dissenting.
In order to collaterally challenge his pri- or deportation proceeding, Aguirre-Tello must establish that the proceeding was fundamentally unfair and that he was prejudiced by that unfairness. As the majority opinion correctly acknowledges, “the burden of proof in a collateral attack on a deportation order is on a defendant based on the presumption of regularity that attaches to a final deportation order.” United States v. Arevalo-Tavares, 210 F.3d 1198, 1200 (10th Cir.2000). Despite that presumption, the majority holds that Aguirre-Tello established such fundamental unfairness and prejudice because his “due process rights were violated by the failure to give an adequate explanation of the discretionary relief available to him,” Majority Op. at 1189, because that violation effectively deprived him of his right to appeal, and because there was a reasonable probability that he could have avoided deportation had he fully understood the discretionary relief available to him. I disagree with all of those conclusions, and respectfully dissent.
I would hold as follows: (I) Aguirre-Tello was adequately advised that he would be eligible the next day for some kind of relief from deportation; (II) Aguirre-Tello had no constitutional right to a § 212(c) waiver or to be advised of the possibility of such a waiver, so the IJ’s alleged failure to so advise Aguirre-Tello did not render his deportation proceeding fundamentally unfair; and (III) even if the deportation proceeding was defective because Aguirre-Tello was inadequately informed of the possibility of a § 212(c) waiver, Aguirre-Tello must still demonstrate prejudice, which he has failed to do under any standard articulated by the majority.
I.
The majority first concludes that the IJ in fact inadequately explained the waiver of deportation potentially available to Aguirre-Tello, thereby rendering his deportation proceeding fundamentally unfair. This conclusion appears to be based upon the fact that the IJ used the term “pardon” as opposed to the term “waiver” in his colloquy with Aguirre-Tello, and that Aguirre-Tello was somehow misled as to the purportedly different legal consequences flowing from those two concepts and the “wide differences in the availability of the two remedies.” Majority Op. at 1190 n.7. Additionally, the majority relies upon the district court’s finding that Aguirre-Tello had not been given a list of free legal services prior to the hearing nor had he been advised that his bond had been set at $20,000. Contrary to the majority, I would find that none of those factors alter the inescapable conclusion I draw from the colloquy — that Aguirre-Tel-lo knowingly and with full understanding of his situation expressed his desire to *1198 return immediately to Mexico rather than remain for even a day to try to avoid deportation.
A.
I highlight the crucial aspects of the colloquy itself, noting that there is no dispute that Aguirre-Tello understood English, having lived in the United States since the age of four. Indeed, he was one of three potential deportees who specifically asked to have the hearing conducted in English. The IJ directly and individually told Aguirre-Tello, “You are not today eligible for a pardon, but you would be tomorrow. Do you want your case postponed to see if you might be granted a pardon and allowed to remain in this country?” Appellant’s App. at 24 (emphasis added). Aguirre-Tello responded “[n]o” when asked if he wanted his case postponed to be “allowed to stay in this country.” Id.
After explaining to him the consequences of being deported, which Aguirre-Tello stated three times he understood, the IJ then told him, “So that if you want to stay in the US, this is the time to, shall we say, fight it out and try to remain; do you understand that?” Id. at 25 (emphasis added). Aguirre-Tello responded, “I understand.” The IJ then said, “Now that you know all that, do you want to apply for a pardon?” to which Aguirre-Tello replied, “[n]o.” Id. The IJ then specifically asked him why not, to which Aguirre-Tello said, “I want to voluntarily return to my country.” Id. The IJ inquired one more time: “[A]re you saying you just want to go back?” to which Aguirre-Tello replied, “[tjhat’s it.” Id. at 26.
While the IJ twice referred to seeking a “pardon,” the IJ made it abundantly clear that the possibility under consideration was that Aguirre-Tello would be allowed to remain in the United States and avoid deportation. That is precisely the result Aguirre-Tello would have obtained if he successfully sought a waiver of his deportation. Aguirre-Tello was adamant, however, that he wished to return to Mexico. From that colloquy and the' surrounding circumstances, I conclude that Aguirre-Tello was adequately informed that he would be eligible the next day to seek avoidance of deportation and that he knowingly and willingly declined to pursue that opportunity.
Notwithstanding Aguirre-Tello’s stated desire to return to Mexico, the majority opinion argues that this intention should be disregarded based on the speculation that (1) Aguirre-Tello misunderstood the differences in the availability of a waiver of deportation, as opposed to a pardon; and (2) that a correct understanding of the differences between the two would have caused him to change his mind and seek a waiver. I disagree. It defies common sense to believe that the IJ’s use of the word “pardon” as opposed to “waiver” would have made any difference to Aguirre-Tello. Regardless of the particular term used, the IJ repeatedly told Aguirre-Tello that if he waited a day, he would have the opportunity to try to avoid deportation and remain in this country. Aguirre-Tello repeatedly stated that he did not want to do that, and that he wished to be deported to Mexico.
Further developing its “pardon vs. waiver” argument, the majority opinion places great reliance on a chart published by the Executive Office of Immigration Review which showed that, between 1989 and 1995, some 51.5% of all applications for a § 212(c) waiver were granted. What the chart does not show, however, is what proportion of those successful waiver applicants were convicted of serious violent felonies comparable to Aguirre-Tello’s conviction for attempted murder. Without any indication that any of those successful *1199 applicants were similarly situated to Aguirre-Tello, the conclusion that Aguirre-Tello had at least a 50% chance of receiving a discretionary waiver is pure speculation, if not actually misleading. Additionally, the argument improperly presumes a legal obligation on the part of the IJ to have advised Aguirre-Tello not only of the differences between a pardon and a waiver, but of a hypothetical difference in the chances of success.
Moreover, despite the majority opinion’s speculation here that a § 212(c) waiver was much more likely to succeed than a pardon, in fact both pardon and waiver are acts of grace, left to the complete and unfettered discretion of the one from whom it is sought. “Suspension of deportation is ... an act of grace that rests in the unfettered discretion of the Attorney General.” Escudero-Corona v. INS, 244 F.3d 608, 615 (8th Cir.2001) (quotation omitted); see also Ashki v. INS, 233 F.3d 913, 921 (6th Cir.2000). As the Eleventh Circuit succinctly stated:
An alien’s actual chances of receiving such discretionary relief [suspension of deportation] are too speculative, and too far beyond the capability of judicial review, to conclude that the alien has actually suffered prejudice from being ineligible for suspension of deportation.... Just as a court cannot review the inherently ‘subjective’ judgments made by the executive in deciding whether to commute a life sentence, this Court cannot predict the subjective and fact-intensive judgments that the Attorney General would make in deciding whether to grant extraordinary relief, such as the suspension of deportation.... The alien cannot demonstrate prejudice, much less substantial prejudice, arising from the ineligibility for such an ‘act of grace’ because no standards exist for a court to determine whether the executive would have granted the extraordinary relief anyway.
Mejia Rodriguez v. Reno, 178 F.3d 1139, 1148 (11th Cir.1999) (citation omitted).
Indeed, the Supreme Court, in describing the nature of discretionary relief from deportation provided in a different section of the then applicable statutory scheme, noted its prior description of “the Attorney General’s suspension of deportation ... as an act of grace which is accorded pursuant to her unfettered discretion ... [similar] to a judge’s power to suspend the execution of a sentence, or the President’s to pardon a convict.” INS v. Yueh-Shaio Yang, 519 U.S. 26, 30, 117 S.Ct. 350, 136 L.Ed.2d 288 (1996) (emphasis added) (internal quotations and citations omitted); see also Ashby v. INS, 961 F.2d 555, 557 n. 3 (5th Cir.1992) (noting that “the ultimate decision whether to suspend deportation is a matter of grace similar to a Presidential pardon”) (quotations omitted); United States v. Adame-Salgado, 214 F.Supp.2d 853, 864 (N.D.Ill.2002) (noting that “an alien’s ability to obtain § 212(c) relief was a matter of sovereign grace — the rough equivalent of an executive pardon of a person convicted of a crime — not a matter of right”). As we discuss more fully below, just as there is no constitutional right to such discretionary relief, so too its completely discretionary availability renders meaningless any prediction about whether or not Aguirre-Tello would have received it.
I therefore disagree with the majority’s assertion that there was in fact a significant difference between the availability of a pardon, as opposed to a § 212(c) waiver. I also disagree with its assertion that anyone could predict what Aguirre-Tello’s chances were of obtaining a waiver, and that Aguirre-Tello’s understanding that it was a discretionary waiver he could have sought, as opposed to a discretionary pardon, would have made one iota of difference to him. Rather, I conclude that Aguirre-Tello understood that he could seek to avoid deportation, but chose not to.
*1200 B.
The majority opinion also errs by affirming the district court’s conclusion that Aguirre-Tello had not been given a list of free legal services prior to his deportation hearing. I would hold that the district court’s finding that Aguirre-Tello was not given such a list was clearly erroneous. The IJ specifically stated to Aguirre-Tello and the other potential deportees, “You each have a list of free legal services.” Appellant’s App. at 7-8. There is no indication that anyone present denied having that list. Unless we are to disregard the presumption of regularity which we must accord to the deportation hearing, or disregard the IJ’s explicit representation, we must assume that the IJ accurately represented the situation. Aguirre-Tello’s denial, some seven years later, that he was given a list does not persuade me to the contrary.
C.
Finally, I cannot believe that Aguirre-Tello’s awareness that his bond had been set at $20,000 would have altered his decision to forego postponement of his deportation hearing and decline any appeal. At the hearing on his motion to dismiss his indictment, Aguirre-Tello never testified that an awareness of his bond status would have caused him to make any different decisions. As indicated above, the colloquy between Aguirre-Tello and the IJ clearly indicate that Aguirre-Tello was not interested in appealing any decision, was not interested in obtaining legal assistance, and was not interested in postponing his deportation hearing for even a day. He was interested in one thing only — returning to Mexico as quickly as possible.
II.
As I read the majority opinion, it confers a constitutional due process right on potential deportees to be informed of (1) the existence of various forms of executive clemency; (2) the procedures to be followed to avail oneself of those forms; (3) the time table for pursuing those forms of relief; and (4) the chances for success.[1] I strongly disagree. There is no constitutional right to apply for a § 212(c) discretionary waiver. Aguirre-Tello therefore had no constitutional right to be advised of the possibility of such a waiver, and the IJ’s failure to so advise him did not render his deportation proceeding fundamentally unfair.[2]
The majority begins by noting correctly that we have characterized the IJ’s obli *1201 gation to inform a potential deportee of his “apparent eligibility” for § 212(c) relief as a “duty.”[3] See United States v. Mendoza-Lopez, 7 F.3d 1483, 1485 (10th Cir.1993), impliedly overruled on other grounds by United States v. Fagan, 162 F.3d 1280 (10th Cir.1998); Michelson v. INS, 897 F.2d 465, 468 (10th Cir.1990). However, we have also noted the parameters of that duty: “A deportation hearing is unlike a law school exam; the immigration judge is not required to construct elaborate theories, marshal obscure facts and develop an arguable basis for relief from deportation. Rather, the judge need only inform the alien of ‘apparent eligibility’ for relief.” Michelson, 897 F.2d at 468.
The majority then observes that the Ninth Circuit, in which Aguirre-Tello’s deportation hearing occurred, has described the regulatory obligation to inform aliens of apparently available relief as “mandatory.” See United States v. Arrieta, 224 F.3d 1076, 1079 (9th Cir.2000) (“We have stated that where the record contains an inference that the petitioner is eligible for relief from deportation, the IJ must advise the alien of this possibility and give him the opportunity to develop the issue. Indeed, we have found this requirement to be mandatory.”) (quotations and citations omitted). The majority fails to explain, however, how the Ninth Circuit’s characterization of the IJ’s duty is relevant to our resolution of this case in our circuit.
More significantly, however, I disagree with the majority’s conclusion that deportees have a constitutional right to § 212(c) discretionary relief, such that the IJ’s failure to inform them of the existence of that relief, as well as the procedures required to seek such relief and its likely availability, renders their deportation proceedings fundamentally unfair. I begin with the undisputed proposition that a potential deportee is entitled in his deportation proceeding to procedural due process under the Fifth Amendment, designed to ensure that the proceeding is fundamentally fair. Deportation proceedings are, of course, civil proceedings, not criminal ones, “and various constitutional protections associated with criminal proceedings therefore are not required.” Michelson, 897 F.2d at 467 (citing INS v. Lopez-Mendoza, 468 U.S. 1032, 1038-39, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984)). The Supreme Court has not further defined what fundamental fairness requires in a civil deportation proceeding context, but it has suggested that it prohibits “procedural errors ... so fundamental that they may functionally deprive the alien of judicial review.” United States v. Mendoza-Lopez, 481 U.S. 828, 839 n. 17, 107 S.Ct. 2148, 95 L.Ed.2d 772 (1987). Thus, Aguirre-Tello must establish that the deportation proceedings functionally deprived him of the opportunity for judicial review and that the proceedings were fundamentally unfair. Id. at 838-39, 107 S.Ct. 2148; see also 8 U.S.C. § 1326(d) (effectively codifying the holding of Mendoza-Lopez).
We have stated that, “[w]hen facing deportation ... aliens are entitled to procedural due process, which provides an opportunity to be heard at a meaningful time and in a meaningful way.” Aguilera v. *1202 Kirkpatrick, 241 F.3d 1286, 1292 (10th Cir. 2001) (quotations and citations omitted). Aguirre-Tello received that, and he was entitled to nothing more. I agree with the Fifth Circuit that “eligibility for § 212(c) relief is not a liberty or property interest warranting due process protection, [and therefore] the Immigration Judge’s error in failing to explain [the deportee’s] eligibility does not rise to the level of fundamental unfairness.” United States v. Lopez-Ortiz, 313 F.3d 225, 231 (5th Cir.2002), cert. denied, — U.S.-, 123 S.Ct. 922, 154 L.Ed.2d 827 (2003); see also Smith v. Ashcroft, 295 F.3d 425, 430 (4th Cir.2002) (holding that “the discretionary right to suspension of deportation does not give rise to a liberty or property interest protected by the Due Process Clause”); Oguejiofor v. Attorney General, 277 F.3d 1305, 1309 (11th Cir.2002) (“Under our precedent, an alien has no constitutionally protected right to discretionary relief or to be eligible for discretionary relief.”); Escudero-Corona, 244 F.3d at 615 (“Eligibility for suspension is not a right protected by the Constitution. Suspension of deportation is rather an act of grace that rests in the unfettered discretion of the Attorney General.”); Ashki, 233 F.3d at 921 (“Eligibility for suspension is not a right protected by the Constitution. Suspension of deportation is rather an ‘act of grace’ that rests in the ‘unfettered discretion’ of the Attorney General. Because suspension of deportation is discretionary, it does not create a protectible liberty or property interest.”).
In sum, the IJ essentially complied with the INS regulation directing him to inform Aguirre-Tello of his apparent imminent eligibility for relief from deportation. Even were I to conclude that the IJ failed to so inform Aguirre-Tello, or failed to adequately inform him, Aguirre-Tello has not established that his deportation proceeding was fundamentally unfair. He was entitled to procedural due process — ■ the opportunity to be heard at a meaningful time and in a meaningful way. He received that. Aguirre-Tello had no constitutional right to be informed of, or to receive, a § 212(c) waiver. Accordingly, his deportation proceeding was not rendered fundamentally unfair by the IJ’s failure to specifically inform him about his imminent apparent eligibility for § 212(c) relief.
III.
In addition to concluding that the deportation proceeding was not fundamentally fair, the majority also concludes that Aguirre-Tello was prejudiced thereby. See United States v. Wittgenstein, 163 F.3d 1164, 1170 (10th Cir.1998) (“ ‘In order to establish fundamental unfairness, the alien must show that he was prejudiced.’ ”) (quoting United States v. Meraz-Valeta, 26 F.3d 992, 998 (10th Cir.1994)). While the majority points out that there is some confusion as to the precise standard to be used to determine whether the alien has demonstrated prejudice, I would hold that, assuming arguendo some deficiencies in his deportation proceeding, Aguirre-Tello failed to demonstrate prejudice under any standard.[4]
*1203 The majority assumes that, given the statistic that approximately one-half of all waivers of deportation sought under the statute then in effect (8 U.S.C. § 1182(c)) were granted, there is a reasonable probability that Aguirre-Tello’s waiver would have been granted as well.[5] As indicated above, such a prediction is pure speculation, and therefore meaningless, given that we do not know how many of those receiving waivers were similarly situated to Aguirre-Tello in being deportable because they had been convicted of a serious violent aggravated felony like attempted murder. The majority opines that relatively modest favorable circumstances surrounding Aguirre-Tello (that his parents were legal permanent residents, that he had lived in the United States since age four although he had legally lived in this country only since age seventeen or eighteen, and that he had no other criminal record) would outweigh the fact that he had been convicted of a serious violent crime (attempted murder) in the discretionary calculus that the Attorney General would employ under § 1182(c). I strongly disagree. When deciding who is deserving of discretionary relief from deportation, among the many aliens eligible for such relief, there is not even a reasonable probability that the Attorney General would grant such relief to one so recently convicted of such a serious violent crime. Of. United States v. Wilson, 316 F.3d 506, 511 (4th Cir.2003) (upholding district court’s finding that “a fifty-fifty chance [of obtaining discretionary § 1182(c) relief] was not sufficient to establish prejudice”).
I therefore respectfully dissent.

. Carried to its logical conclusion, the majority's argument that Aguirre-Tello was deprived of fundamental fairness by the IJ's failure to explain to him that he could apply for a waiver of deportation, which allegedly had a 50% chance of succeeding, would suggest that criminal defendants not only must be informed of their right to appeal an adverse verdict, but also must be told the procedures to be followed in an appeal and their chances for success. We, of course, impose no such requirement on judges in criminal cases. If we do not do so in the criminal context, where defendants are entitled to more constitutional protections, it would make little sense to impose such a requirement in civil proceedings like a deportation hearing.

. The majority opinion attempts to avoid this conclusion by asserting that it is only enforcing a regulation. But it does not acknowledge that its reasoning extends to the only available conclusion, which is that the failure to follow the regulation results in fundamental unfairness — an indisputably constitutional due process concept. The majority opinion affirms the district court's judgment, which specifically concludes as follows:
[D]ue to the IJ’s failure to adequately satisfy his obligations at the deportation proceeding, ... Defendant could not have made a "considered and intelligent” waiver of his appeal rights, and the Court has no choice but to declare the prior deportation, upon which the current indictment is based, to be unconstitutional.
Memorandum Op. and Order at 14, Appellant's App. at 177.

. While the majority glosses over this issue, Aguirre-Tello was not in fact eligible for any relief at the time of his deportation hearing. The IJ deduced from the information he had about Aguirre-Tello that Aguirre-Tello would satisfy the seven-year continuous residency requirement for eligibility for § 212(c) relief the next day, but he was not, in fact, eligible on the day of the deportation hearing. Where would the majority draw the line? If it appeared Aguirre-Tello would be eligible in a week, a month, two months, would the majority find the IJ violated his duty to inform Aguirre-Tello of his apparent future eligibility? Thus, at its most basic level, either Aguirre-Tello was eligible or he was not eligible to apply for a waiver. On the day of his deportation hearing, he was not eligible.

. The majority rejects the government’s argument that, on the merits of an § 1182(c) waiver application, Aguirre-Tello would have had to show that his deportation would cause extreme hardship for himself or his family. I note that other circuits have applied that standard to § 1182(c) waivers. See, e.g., Calcano-Martinez v. INS, 232 F.3d 328, 331 (2d Cir. 2000); Liang v. INS, 206 F.3d 308, 311 (3d Cir.2000); Turkhan v. Perryman, 188 F.3d 814, 818 (7th Cir.1999). The majority dismisses these cases applying an extreme hardship standard as cases involving “mere careless citation.” Majority Op. at 1195 n.12. While I would be reluctant to so cavalierly dismiss statements from our fellow circuit courts, it makes no difference to my analysis. As explained, infra, I would find it exceeding *1203 ly unlikely that Aguirre-Tello would have prevailed on a waiver application, no matter what standard was applied.

. While articulating the standard for establishing prejudice as "whether there is a reasonable probability that Aguirre-Tello would have obtained relief from deportation,” Majority Op. at 1193, the majority in fact applies that standard in a way that significantly reduces it. Thus, the majority equates it to a "might have” obtained relief standard. As applied to this case, the majority's "reasonable probability” standard only requires Aguirre-Tello to establish a possibility that he might obtain relief.