**Alonso CHACON–CORRAL, Petitioner,**

v.

**Scott WEBER, District Director of the Bureau of Immigration and Customs Enforcement, Respondent.**

No. CIV.A. 03–K–132.

United States District Court,
D. Colorado.

April 24, 2003.

Jim Salvator, Lafayette, CO, for Petitioner.

Mark S. Pestal, United States Attorney's Office, Denver, CO, for Respondent.

## ORDER GRANTING APPLICATION FOR WRIT OF HABEAS CORPUS

KANE, District Judge.

This immigration matter is before me on Petitioner Alonso Chacon–Corral's Application for Writ of Habeas Corpus under 28 U.S.C. § 2241. Petitioner, a 24–year old Mexican national, has been held at the regional Immigration and Naturalization Service (INS) detention facility near Denver since mid-January after the INS initiated proceedings to reinstate a prior 1997 removal order under § 241(a)(5) of the Immigration and Naturalization Act (INA), codified at 8 U.S.C. § 1231(a)(5).[1] Chacon–Corral was deported under the prior

---

1. INA § 241(a)(5) was added by the Illegal Immigration Reform and Immigrant Responsibility Act, Pub.L. 104–208, 110 Stat. 3009–546 (1996), and provides that if an alien illegally reenters the country after having been removed or having departed voluntarily under an order of removal, the prior order of re-

order in September 1997, but reentered the country illegally in early 1998. He has lived in the Denver area since. In February 2000, he married a United States citizen, Maria Hidrogo, with whom he has a three-year old daughter and a seven-year old stepson, also United States citizens. While it appears he neither reads nor speaks English well, Petitioner owns a home in the Denver area and works in the construction industry at an hourly wage of over $14.00 an hour. Other than his arrests on INS charges, Chacon–Corral has had no criminal arrests or convictions.

In November 2000, Ms. Hidrogo filed an immigrant petition for relative pursuant to INA § 201(b) to start the process for seeking permanent residence for her husband. Notwithstanding Chacon–Corral's 1997 deportation and reentry, the petition was approved in April 2001. On the basis of that approval, in January 2002, Petitioner filed a Form I–485 application for adjustment of status/lawful permanent residence under INA § 245, and Supplement A thereto. Again notwithstanding his 1997 deportation and reentry, the INS accepted the application, along with $245 in filing fees plus $1000 as an "additional amount" in accordance with INA § 245(i) to be considered for adjustment notwithstanding being in unlawful immigration status.

During the course of a routine interview on his application in December 2002, Petitioner told the interviewer, Janet Gibson, that he had previously been arrested by the INS for working illegally and had been deported. Rather than informing him that he might be subject to reinstatement under § 241(a)(5), Petitioner claims Gibson told him he needed to renew his work permit and that he should return to the INS office on January 15, 2003 to do so.

In the interim, handwritten notes signed by Gibson in the "Action Block" of Petitioner's Form I–485 indicate Petitioner's application for permanent residence or adjustment of status was denied on January 6, 2003. Formal notice of that decision was not sent to Petitioner until January 14, 2003, the day before he was to appear at the INS office to renew his work permit. The ground stated for the decision was that Petitioner was subject to the reinstatement of his 1997 deportation under § 245(a)(1), and as such, could not apply for any relief under the INA, including permanent residence or adjustment of status. Petitioner had no knowledge of the decision or the grounds for it when he appeared at the INS office on January 15, 2003.

On January 15, instead of renewing his work permit, the INS arrested Petitioner and served him with reinstatement papers. He signed the papers, including an affidavit in which he confirmed his 1997 deportation and subsequent illegal reentry and was immediately transferred to the regional INS detention facility pending reinstatement of the prior order and deportation. To date, the INS has not signed the space on the Form I–871 that turns the "Notice" of intent to reinstate prior order into an "Order" of reinstatement. Nevertheless, Petitioner remains in INS custody, away from his job, his wife and his family, being held without bond.

Petitioner filed his habeas corpus application on January 22, 2003, challenging the reinstatement proceedings generally, arguing the directive to renew his work application was either an attempt to entrap him or evidence that the INS itself was confused by the "twists and turns" of federal immigration law. Application, ¶ 13.[2] Peti-

---

moval is reinstated from its original date and is not subject to being reopened or reviewed.

2. Unfortunately, Petitioner's experience does not appear to have been out of the ordinary, and may, in fact, be an approved means by which the INS effects arrests in reinstatement

tioner contends he has the right to seek a waiver of the 1997 removal order and disputes what he claims is INS policy to refuse to process such applications and instead pursue reinstatement and removal proceedings against the applicant. More specific to his habeas application, however, is Petitioner's claim that the underlying 1997 removal order was constitutionally infirm such that any attempt to "reinstate" it would itself be invalid.[3] For his relief, Petitioner seeks a vacatur of the 1997 removal order and a cessation of the reinstatement proceedings initiated January 15, 2003. In the alternative, Petitioner seeks to have his application for a waiver of the 1997 order or an adjustment of his status on the basis of his marriage considered on its merits.

I held a hearing on Petitioner's habeas corpus application on March 18, 2003. Between March 18 and April 14, 2003, I received three supplemental traverses from Petitioner providing additional legal argument and documents related to Petitioner's 1997 removal proceedings. I find I have jurisdiction to consider Petitioner's habeas corpus petition and conclude Petitioner's detention under the facts and circumstances of this case is unconstitutional. The following constitute my findings and conclusions.

### *JURISDICTION.*

■ The threshold issue before me is whether I have habeas jurisdiction to consider the constitutionality of Petitioner's detention under INS § 241(a)(5) in this case, even if it involves a collateral attack on Petitioner's 1997 removal order. *See* 28 U.S.C. § 2241. I conclude that I do. *See*

*INS v. St. Cyr,* 533 U.S. 289, 305–308, 310–12, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (holding that while HRIRA did, in fact, repeal immigration statute providing habeas relief for aliens, it did not deprive federal courts of their historical jurisdiction under 28 U.S.C. § 2241 to review the legality of Executive detention or to answer questions of law that arise in the context of discretionary relief). INA § 241(a)(5)'s statement that, under appropriate circumstances, a prior order of removal is "reinstated from its original date" and "is not subject to being reopened or reviewed" relates to a reopening or review of the prior order by an immigration judge on its merits, and not to a review of that order by an Article III court under habeas corpus standards.

The Ninth Circuit's decision in *Alvarenga–Villalobos v. Ashcroft,* 271 F.3d 1169 (9th Cir.2001), rejecting alien's attempt collaterally to attack a reinstated prior deportation under INA § 241(a)(5) and invoked by the government in its Response brief at p. 4, demands no different result given that the collateral attack in *Alvarenga–Villalobos* was based not on alleged constitutional infirmities in the underlying order, but on its purported invalidity under a subsequent change in immigration law. *Id.* at 1172–73. In *Alvarenga–Villalobos,* in fact, the constitutionality of the prior order was expressly presumed, *id.* at 1173, with the Court stating it "need not resolve th[e] issue" of the underlying order's alleged invalidity because the order "was perfectly lawful under the law at the time he was deported." *Id.* at 1173. Given that Alvarenga–Villalobos "had been

---

cases. *See, e.g., Castro–Cortez v. INS,* 239 F.3d 1037, 1042–43 (9th Cir.2001) (describing similar experiences of petitioners in consolidated appeals from district court decisions on reinstatement orders who appeared at INS offices on routine or unrelated proceedings and were then arrested and served with a

Notice of Intent/Decision to Reinstate Prior Order).

**3.** Petitioner claims the underlying 1997 "group proceeding" removal order was unlawful and the result of an ineffective waiver of his right to judicial review.

given one full and fair hearing, including the right to judicial review of that hearing," the Court concluded that reinstating his underlying order without a "second bite at the apple" would not offend due process. *Id.* at 1173, 1174.

Here, the "fullness and fairness" of Petitioner's original hearing is precisely the issue in question and the alleged constitutional infirmity of the resulting deportation order is within my purview under *St. Cyr.*

The government in its written Response to Petitioner's habeas application did not dispute the existence of subject matter jurisdiction. Instead, the government simply asserted that the factual prerequisites for reinstatement under § 241(a)(5) had been established such that reinstatement of the 1997 deportation order was "lawful." Resp. to Petr's Application for Writ of Habeas Corpus, p. 3. The government did briefly raise the specter of a lack of jurisdiction at the March 18 hearing, but provided little in the way of explanation or analysis.[4]

First the government asserted that, because the INS has yet to sign the form Notice of Intent/Decision to Reinstate Prior Order, the reinstatement process is ongoing and I am precluded by operation of 8 U.S.C. § 1252(g) from reviewing it. Section 1252(g), enacted as part of IIRIRA in 1996, precludes judicial review of the Executive's "decision or action" to "commence proceedings, adjudicate cases, or execute removal orders against any alien under this Act." This argument is not only disingenuous—the "process" for reinstatement under § 1231(a)(5) is not ongoing in this case and is in fact complete but for the ministerial act of the Service signing at the bottom of the already filled out Notice of Intent/Decision to Reinstate Prior Order—but it is also contrary to the interpretation of § 1252(g) given by the United States Supreme Court in *Reno v. American–Arab Anti–Discrimination Committee,* 525 U.S. 471, 483–84, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999).[5] As interpreted by the Supreme Court, § 1252(g) is to be construed narrowly and bars review only of those limited categories of discretionary decisions described. *Id. See Jurado–Gutierrez v. Greene,* 190 F.3d 1135 (10th Cir.1999). As the Court explained after reviewing the history of its enactment, § 1252(g) was intended to protect the INS from judicial challenges to its discretionary decisions to pursue or execute removal orders specifically because the fact that it sometimes exercised that discretion to *decline* to pursue or execute such orders had "opened the door to litigation in instances where [it] [did not]." *Arab–American* at 484 (citing 6 C. Gordeon, S. Mailman, & S. Yale–Loehr, Immigration Law and Procedure § 72.03[2][h] (1998)). Petitioner in this case is not seeking review of the decision to commence reinstatement proceedings against him (although as a matter of selection and priority, one must wonder why the agency charged with "Homeland Security" did in fact come to pursue the deportation of this non-criminal, tax-paying, visa-eligible alien) or to enjoin execution of the 1997 Order upon reinstatement. Rather, Petitioner is seeking his release from custody because the grounds on which he

---

4. The government's principle jurisdictional defense, while unarticulated as such, is that because Petitioner "waived" his right in 1997 to appeal the original deportation order, he has "already received all of the due process to which he is entitled." *See* Govt.'s Response to Application for Writ of Habeas Corpus at p. 4 (citing *Alvarenga–Villalobos* ). Petitioner's claims in this case beg the question presumed by that statement, and it is rejected for the reasons set forth above.

5. I note that deliberate inaction in finalizing a Form I–871 for the sole purpose of avoiding review might itself form the basis for habeas relief. *See St. Cyr,* 533 U.S at 307–08, 121 S.Ct. 2271.

is being held are unconstitutional. With respect to this quest, § 1252(g) is inapplicable.[6]

Next the government posited that "any challenge to a reinstatement order must be done before the Tenth Circuit Court of Appeals [under] § 1252(a)." Hg. Tr. at 20. The argument is curious given the previous assertion that no final order of reinstatement has been entered, but even assuming that there was, the argument is rejected. The fact "judicial review" of a final reinstatement order may be had in the Court of Appeals under § 1252(a) does not bar "habeas corpus" review in the district court under appropriate circumstances. As the Supreme Court explained in *St. Cyr*, "[i]n the immigration context, 'judicial review' and 'habeas corpus' have historically distinct meanings." 533 U.S. at 311, 121 S.Ct. 2271. Section 1252(a)(1) "speaks of 'judicial review'—that is, full, nonhabeas review," whereas review under the general habeas statute is substantially more "limited." *Id.* at 312, 121 S.Ct. 2271 (concluding reference to "judicial review" in § 1252(a) was insufficient to "bar jurisdiction pursuant to the general habeas statute"). Because Chacon–Corral challenges the constitutionality of the 1997 Order and as a result the constitutionality of his current detention under § 241(a)(5) to reinstate it, general habeas corpus jurisdiction exists in this court under 28 U.S.C. § 2441.

### DISCUSSION.

The following is a chronology of relevant events from the documents and admissions forming the record in this case:

1. June 1, 1997. Date government claims Chacon–Corral first entered the United States illegally at El Paso, Texas.

(Warrant for Arrest, Tab A–1, Govt.'s Response to Petition for Writ of Habeas Corpus). Chacon–Corral moves to Denver, Colorado, and begins working as a laborer. He was 18 years old at the time.

2. September 16, 1997. INS arrests Petitioner in Steamboat Springs and initiates removal proceedings. *See* Notice to Appear (Tab A–1). That same day, Petitioner is served with the following INS forms, all included at Tab A–1 of government's response, signing each where requested:
   — Form I–200 Warrant for Arrest;
   — Form I–286 Notice of Custody Determination, releasing Chacon–Corral on $5,000 bond and including space to request for redetermination of custody determination by an immigration judge, to which Chacon–Corral checked "I do." Chacon–Corral did not post bond, and remained in INS custody at its Aurora facility until his deportation on September 26, 1997.
   — Form I–862 Notice to Appear, notifying Petitioner he was being considered "alien present in the United States who has not been admitted or paroled" and was therefore "subject to removal from the United States pursuant . . . . [to INA] Section 212(a)(6)(A)(i) [8 U.S.C. § 1182(a)(6)(A)(i) ]." Page two of the Notice provides space for an alien to request an "immediate hearing" and "waive my right to have a 10–day period prior to appearing before an immigration judge" in order to "expedite a determination in my case," which Petitioner signed.

These forms are not in Spanish and there is no indication, nor assertion by

---

6. Nor am I precluded from considering Petitioner's procedural challenge to the denial of his application for adjustment of status because the ground offered by the INS in denying it, i.e., that the Service was barred by INA § 241(a)(5) from granting it, did not constitute an exercise of the INS's discretion.

the government, that they were translated for Petitioner into Spanish.

3. September 23, 1997. Two documents served on Petitioner in the care of Mr. Dobson at the INS's Aurora facility where he was being held: A Notice of Custody Redetermination Hearing before the Immigration Proceedings and a Notice of Hearing in Removal Proceedings. Both documents, which included the advisement that Petitioner was entitled to be represented by counsel at the hearings and were served with a list of Legal Service attorneys, were in English-only and set hearings for 8:30 and 9:00 a.m. the following morning, respectively. (Documents attached to Petr.'s Supplemental Traverse, filed 3/27/03.)

4. September 24, 1997. Petitioner appeared for his removal proceedings before Immigration Judge J.P. Vandello as part a group that included at least one criminal alien, Jorge Samuel Caraveo–Marquez. (*See* Individual Records of Proceedings (ROPs) for Chacon–Corral and Caraveo–Marquez proceedings, both dated 9/24/97 at 9:00 a.m., attached to Petr.'s Supplemental Traverse.) [7] According to Chacon–Corral's ROP, the hearing took place at 9:00 a.m., the charge was inadmissi-

bility under "[INA § ] 212(a)(06)(A)(i)," the disposition was "X–Rem" (removal ordered), and a handwritten letter "W" appears by the word "Appeal." Of the list of potential actions identified under "ADVISALS & ITEMS COVERED BY IJ IN REMOVAL/OTHER," nothing is marked, including no indication that an interpreter was present or used, that the alien was sworn under oath, or that his recorded waiver was voluntary or the consequences thereof explained. A tape of Chacon–Corral's hearing, his ROP states, is "contained in ROP A# 70–565–013," the alien number of Caraveo–Marquez.

The IJ's written order, which was also identical in form and content to that of Caraveo–Marquez and probably all 21 of the aliens present at the September 24 hearing, states "[u]pon the basis of respondent's admissions, I have determined that the respondent is subject to removal on the charge(s) in the Notice to Appear." Both documents state "Respondent has made no application for relief from removal," and order "that the respondent be removed from the United States to MEXICO on the charge(s) contained in the Notice to Appear." The following also appears at the bottom left hand corner of both Orders:

---

7. Because the government at the March 18 hearing challenged Petitioner's assertion that his was part of a group removal proceeding, Petitioner filed a Supplemental Traverse with additional documents including Caraveo–Marquez's ROP, confirming his hearing was at the same date and time as Chacon–Corral's, and documents demonstrating that Caraveo–Marquez was, in fact, a criminal alien. *See* Caraveo–Marquez ROP (containing handwritten note in the right-hand margin stating Caraveo "not eligible [sic] for CR—convicted PCS Pueblo DC 1997") *and* August 28, 1997 Pueblo District Court Judgment of Conviction, Sentence and Order to Sheriff (reflecting Caraveo–Marquez conviction for attempted purchase of cocaine and suspending his sentence so that he could voluntarily consent to deportation). According to Petitioner, Caraveo–Marquez was the lead case for the morning's proceedings. In the end, this fact appears to have been immaterial, in that an audiotape of the group proceedings finally provided to the court on April 14, 2003, indicates Caraveo's case was handled separately, at the conclusion of the group proceeding itself, in a one-on-one interaction and questioning by the IJ. Ironically, it was the lone criminal alien in the group who received the most adequate process in the 1997 proceedings.

Appeal: WAIVED (A/I/B)[8]

Appeal Due By: Oct. 24, 1997

Petitioner received service of his Order in the "c/o Custodial Officer," on the same day as his hearing, September 24, 1997.

5. September 25, 1997. Two documents are included in the record dated September 25, 1997:(1) Warrant of Removal/Deportation, stating Chacon–Corral is subject to removal/deportation based upon a final order by an immigration judge, stamped "JGreene," then INS District Director, on behalf of INS (included with documents at Tab A–2 of Govt.'s Response); and (2) Form I–294 Warning to Alien Ordered Removed or Deported, stating that in accordance with INA § 212(a)(9), alien remains inadmissible to United States for period of 10 years from date of his departure, and showing stamped form signature of then-INS District Director "JGreene" on the line for "[s]ignature of officer serving warning." (Tab A–3.)[9] In addition, the bottom of Form I–294 includes the following notice/waiver for the alien's signature:

I understand I may not be removed from the United States sooner than seventy-two hours after service of the final order of deportation in my case. I knowingly and voluntarily request to waive this seventy-two hour period

and be deported from the United States as soon as possible.

As the government conceded at the March 18 hearing, there is no signature at the bottom of Chacon–Corral's Form I–294.

6. September 26, 1997. Notwithstanding the lack of a waiver of the 72–hour minimum time period for removal, Petitioner was deported September 26, 1997, 48 hours after service of the final order of deportation. *See* Form I–205, Warrant of Removal/Deportation, p. 2 (indicating Petitioner Alonso Chacon–Corral deported 12/26/97, departure witnessed by INS official Ceasor Meija, DEO). (Govt. Response, Tab A–2.)

7. January 1998. Petitioner reenters United States without inspection, at El Paso, Texas.

8. February 2, 2000. Petitioner marries Maria Hidrogo.

9. November 2000. Ms. Hidrogo files Immigrant Petition for Relative pursuant to INA § 201(b). Petition approved, April 18, 2001. *See* Notice of Action (Ex. 1 to Application for Writ of Habeas Corpus).

10. January 14, 2002. Petitioner files Form I–485 Application to Register Permanent Resident or Adjust Status, citing the approval of his immigrant petition as grounds, together with Supplement A to Form I–485

**8.** At the March 18 hearing, Petitioner's counsel explained that the parenthetical on these form orders is intended to indicate who waived appeal in a particular case—the alien, in which case the letter "A" would be circled; the INS, in which case the letter "I" would be circled; or both the alien and the INS, in which case the "B" would be circled. Tr. at pp. 4–5. None of the letters is circled on the Order at issue in this case.

**9.** The reference to ten years is wrong and directly contrary to the actual language of § 212(a)(9), which prescribes a waiting period of five, not ten, years. 8 U.S.C. § 1182(a)(9)(A)(i), *see* 8 C.F.R. § 212.2(a)("[a]ny alien who has been deported or removed from the United States is inadmissible to the United States unless the alien has remained outside of the United States for five consecutive years since the date of deportation or removal"). Even the five-year restriction is not without exception, moreover, because an alien may apply for reentry on a nonimmigrant visa or nonresident alien border crossing card before the expiration of five years under 8 C.F.R. § 212.2(b).

and pays $1000 to be considered for adjustment notwithstanding unlawful entry under INA § 245(i). Supplement A requires I–485 applicants to provide additional information necessary to the proper application of the various regulatory provisions governing adjustment, including those relevant to INA § 245(i), 8 U.S.C. § 1255(i) "adjustment of status upon payment of additional sum." *See* 8 C.F.R. § 245.10 (outlining process whereby aliens who would otherwise be ineligible for adjustment of status by virtue of having entered the country illegally could "cure" that defect for purposes of § 1255(i) consideration upon payment of the sum of $1000). In completing Supplement A, Petitioner answered Questions 10–12 acknowledging he was not in lawful immigration status and not exempt by virtue of his age or from having to pay the $1000, and was directed to Question 13 requiring him to "pay the additional sum of [$1000][10] . . . under § 245(i) of the Act" to be considered for adjustment. Petitioner's payment of that sum, in addition to the $245 paid to file his I–485, is confirmed by an entry in the space on page 1 of Supplement A acknowledging receipt of "ADJ STATUS SUP $1000" on "1/15/02."

11. December 2002. Petitioner appeared for a routine interview on his still pending I–485 application. In that interview, Petitioner informs officer of previous arrest and deportation. Petitioner claims he was told to report to the INS on January 15, 2003, to renew his work permit.

12. January 6, 2003. In "Action Block" section of Form I–485 reserved for INS use only, word "Denied" handwritten in block, dated 1/6/03 and signed by Janet Gibson.

13. January 14, 2003. Form I–291 Decision on Application for Status as Permanent Resident, denying Petitioner's Form I–485 application on grounds of INA § 241(a)(5), sent to Petitioner via certified mail. (Tab A–1). Attached to Form I–291 is typewritten explanation stating denial of Petitioner's permanent resident/adjustment of status application was mandatory: "Because you appear to be an alien subject to mandatory reinstatement of a prior removal order under Section 241(a)(5) of the Immigration and Nationality Act, as amended, you are not eligible and may not apply for any relief and/or benefits under the [Act]." *Id.* p. 2 (Attachment, Form I–292).

14. January 15, 2003. The precise order of events is unclear from the record, but in a document marked as having been prepared at 9:49 a.m. and entitled Record of Deportable/Inadmissible Alien (Tab A–6) INS Officer Shane Jumper recorded certain identifying and other information about Petitioner and prepared the following "Narrative Created by JUMPER":

Subject is a citizen and national of MEXICO who entered as set forth above. Subject had filed I–485, adjustment of status based on marriage to NUSC (non U.S. citizen)[11] spouse. At that time fingerprints were not submitted. This writer was contacted by DAO Gibson[12] stating that finger-

---

10. The Form did not reflect the change from $650 to $1000 effective at the time of Petitioner's application.

11. I note the record is conflicting on this point, but Ms. Hidrogo's citizenship status is not germane to the matters at issue here.

12. Again, Gibson is the INS officer who conducted Petitioner's December 2002 Form I–

print check had since been returned with a positive match of subject being a prior deport. DAO Gibson consolidated the files and writer took subject into custody and will be served [sic] with Reinstatement.

That same day, when Petitioner appeared at the INS office to renew his work permit, he was arrested, interviewed by Officer Jumper, and served with the following documents:

— Form I–871 Notice of Intent/Decision to Reinstate Prior Order, acknowledged by Petitioner on the same date with check mark by box that said he "did not" wish to make a statement contesting this determination (Tab A–4);

— Form I–214 Spanish language Warning as to Rights–Interview Log, dated 1/15/03 at 12:56 and signed by Officer Jumper. (Tab A–2.)

— Petitioner's Form I–215b "Affidavit," made before Officer Jumper in Spanish confirming facts forming basis for reinstatement proceedings, i.e., that he was deported in 1998[sic], reentered thereafter, had no fear of persecution/torture/etc. upon returning to Mexico. (Tab A–5.)

## A. Validity of 1997 Order.

■ The Fifth Amendment guarantees aliens due process of law in deportation proceedings. See Reno v. Flores, 507 U.S. 292, 306, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993). Petitioner is not challenging the constitutionality of the INS's overall deportation process generally,[13] but the manner in which the applicable regulations were interpreted and applied in his case.

485 interview. See Handwritten notes, Form I–485 (Govt.'s Response, Tab A–1).

13. This process is set forth at 8 C.F.R. §§ 236, 239, and 240.

I agree that the record in this case reveals multiple defects in the process afforded Petitioner before deportation and hold Petitioner's 1997 deportation order invalid.

■ The entire deportation process, from Petitioner's arrest in Steamboat Springs on September 16, 1997 until his deportation on September 26, 1997, took ten days. Petitioner was in INS custody during that entire time and was not advised of his right to be represented at his removal hearing or given a list of legal service providers to call until September 23, the day before his final hearing. He was given a rehearing on the determination that he be retained in custody on a bond amount he could not pay, but that hearing was set for 30 minutes before his final deportation hearing on September 24.

There is no indication that any of the prehearing papers or advisements were in Spanish. The forms themselves are all in English-only. (This is in contrast to the forms and notices served in connection with the subsequent reinstatement proceedings, all of which include Spanish translation or space for certifying that information in English was translated in Spanish.) At least one of the advisements, that was to have been made in person and signed by the INS officer giving it, was instead stamped with the form signature of then-INS Regional Director Joseph Greene. Clearly no personal advisement was made by Director Greene; such pro forma evidence is no evidence that the warning was given at all.

The final hearing itself is rife with due process concerns. Petitioner appeared before an IJ as part of a group of 22 aliens scheduled for hearing at the same time.[14]

14. A tape of the proceedings with certified transcription was submitted by Petitioner in a (third) Supplemental Traverse on April 14, 2003. Under 8 C.F.R. § 240.9, the audiotape of a deportation hearing constitutes the official record of that hearing.

The group included criminal and noncriminal aliens. All were from Mexico. The proceedings conformed generally with the framework for removal hearings described at 8 C.F.R. § 240.10, with the exception that most evidence was received, and waivers of appeal explained and elicited, through a series of collective questions and group answers. The failure even to attempt to ensure that individual respondents knew and understood what was happening to them fails under fundamental principles of due process to comport with the Fifth Amendment.

Other than a role call in which each of the 22 aliens present was asked to say yes if present and the establishment of the date and place of entry by individual name, advisements and questions were directed collectively to the group and responses were recorded as a collective "yes" or "no." This was true for advisements and waivers of rights, as well as for the establishment of the predicate facts for removal. As heard on the audiotaped record of the proceedings in this case, for example, the predicate facts that each alien had entered the United States without inspection and was ineligible for relief from removal were established as follows:

Judge Vandello: .... To all respondents, when you entered this country were you inspected by an Immigration Officer?

Interpreter: (Translates question in Spanish.)
(Various utterances and "nos" can be heard.)

Interpreter: No by all.

Judge Vandello: Now I'm going to see if you might be eligible for any relief from deportation.

Interpreter: (Translates in Spanish.)

Judge Vandello: First you must qualify for voluntary departure .... the ad-

vantage [of which] is you do not have to wait five [15] years to come back if you can get a visa through a family member or through some other method ....

\*     \*     \*     \*     \*     \*

Judge Vandello: So anyone who wants to ask for voluntary departure or ask a question about your status, please raise your right hand.

Interpreter: (Translates in Spanish.)

Judge Vandello: Show no one has raised his hands. So my order in all cases is that you be removed because of entry without inspection.

Audiotape of 9/24/97 Hg. (Third Suppl. Traverse), Transcription at pp. 9–10.

As to Chacon–Corral's waiver of appeal rights:

Judge Vandello: For the people who are ordered removed or deported, you have thirty days to appeal my decision through the Board of Immigration Appeals.

Interpreter: (Translates.)

Judge Vandello: To appeal you will fill out the forms, which will be given to you.

Interpreter: (Translates.)

Judge Vandello: Your case would go to Washington to the Board of Immigration (coughing drowns out rest).

Interpreter: (Translates.)

Judge Vandello: And the Board has the authority to overturn my decision.

Interpreter: (Translates.)

Judge Vandello: Do you understand your appeal rights?

Interpreter: (Translates.)
(Various audible "yes"es can be heard on tape.)

Interpreter: Yes by all.

**15.** Again, this is consistent with the actual language of INA § 212(a)(9).

Judge Vandello: Does anyone wish to appeal?

Interpreter: (Translates.)

(Various "no"s can be heard.)

Interpreter: No by all.

Audiotape of 9/24/97 Hg. (Third Suppl. Traverse), Transcription at pp. 10–11.

The importance of the information conveyed and elicited during a deportation hearing—both for the immediate fate of the alien caught up in it as well as for his future ability to reenter the United States lawfully—cannot be overstated. The immigration laws are technical and complex,[16] and their application in one context, particularly after the enactment of AEDPA and IIRIRA in 1996, may have serious, even draconian, consequences for an alien affected by them in another. A genuine appreciation of the advantage of voluntary departure over forced deportation, for example, may impact an alien's decision to agree to it or not, as can knowledge of the various steps that can be taken from Mexico to obtain authorization to reenter legally, even after deportation. *E.g.*, INA § 212(a)(9)(A)(iii), *codified at* 8 U.S.C. § 1182(a)(9)(A)(iii). In this case, Chacon–Corral's decision to forego voluntary departure was based on his failure to raise his hand when he and 21 other aliens were asked generally to do so. Waiver by "mass silence" in group deportations proceedings has been disapproved generally by courts in various circuits. *E.g. United States v. Lopez–Vasquez*, 1 F.3d 751, 754 (9th Cir.1993).

My concerns with the process afforded Chacon–Corral with respect to his 1997 deportation run deeper than any specific criticism of the manner in which answers were elicited or the use of a group proceeding generally. My concern is with the virtual meaninglessness of the process itself. The appearance is not unlike that of evacuating a building when a fire alarm is blaring. If the crowd heads in one direction and the people are kept moving, the fact someone is calling out another direction or to remain in the building likely means little to any individual group member. Achieving efficiency or expediency at the price of comprehension is too high a price to pay; it is the triumph of form over substance.[17]

As previously stated, the entire process in Chacon–Corral's case took ten days. None of the documents he was given before his deportation—including the Notice to Appear setting forth the charges against him, the Notice advising him of his rights and the conduct of his deportation hearing, the Notice of Custody Determination, the Final Order of the Immigration Judge, or the Warrant for Removal—was in Spanish. To the extent Petitioner's "entitlement" to the advice and presence of legal counsel at his deportation hearing was conveyed at all, Petitioner was neither informed of it nor given a list of legal service contacts until the eve of his final deportation hearing. His initial appearance (for a "hearing" on his custody determination and bond amount, by then entirely pointless) was at 8:30 a.m. the following morning, after which he immediately proceeded to his 9:00 deportation hearing. There, he appeared with a group of 21 other aliens, none of whom had counsel

---

**16.** *See United States v. Aguirre–Tello*, 324 F.3d 1181, 1187 (10th Cir.2003)(noting observation that "immigration law is technical and complex to the point that it is confusing to lawyers, much less to laymen").

**17.** Indeed, acceptance of this herding procedure is entirely inconsistent with the impor-
tance our jurisprudence places on the illicit and tacit pressure imposed on a single child when prayers are offered in a public classroom. Can five years' separation from an individual's family be less egregious? The answer must be no, unless due process is considered less important than religious freedom.

either, and all of whom, like himself, incanted "yes" or "no" or remained silent in response to a series of form questions asked by a weary immigration judge in a manner of minutes. There is a palpable sense of predetermined scripting in the proceeding. A "groupthink" mentality of catechismal responses permeates the collective ritual of the aliens' precession. There was no time for personal rumination or sense that individual answers were sought or even appropriate. It was a Kmart approach to due process, and there is no place for its use by a government agency in this country charged with upholding the Constitution.

■ The right to appeal a deportation decision is inadequate if the waiver was "not the result of considered judgment [ ]. . . ." *United States v. Mendoza–Lopez,* 481 U.S. 828, 840, 107 S.Ct. 2148, 95 L.Ed.2d 772 (1987)(considering validity of prior waiver in 8 U.S.C. § 1326 criminal prosecution for unlawful reentry). The government bears the burden of proving the waiver. *See Brewer v. Williams,* 430 U.S. 387, 404, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977)("it [is] incumbent upon the [government] to prove 'an intentional relinquishment or abandonment of a known right or privilege'") (citation omitted). "Courts should 'indulge every reasonable presumption against waiver,' and they should 'not presume acquiescence in the loss of fundamental rights.'" *Barker v. Wingo,* 407 U.S. 514, 525, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) (citations omitted).

■ As the government conceded at the March 18 hearing, there is no indication on any of the documents submitted in connection with Petitioner's 1997 removal proceedings who, exactly, waived review or that the factual prerequisites for a valid waiver were established in the first instance. Petitioner's written ROP, in fact, does not even confirm that Chacon–Corral was sworn under oath, let alone that he

was advised of his rights and knowingly and voluntarily waived them. That the written record, the government concedes, "could have been more clear" in this regard is an understatement unworthy of a presumption of constitutionality. While I decline the opportunity to declare group removal proceedings unconstitutional *per se,* I assert that when the Executive branch opts to use them in administrative adjudications, a heightened standard of care in their conduct and accuracy in their recording is necessary to ensure that individual rights are being accounted for and observed. At a minimum, a determination that an alien has heard and understood his rights and the consequences of their waiver and yet agrees voluntarily to waive them must be undertaken individual by individual, lest a chorus of "yes"es or "no"s make a dissenter feel obligated or coerced to conform.

Finally, I note due process concerns did not end with the issuance of the IJ's final removal order in this case. Petitioner, as set forth above, was deported fewer than 48 hours after the order was issued in violation of his right to a 72–hour delay, ostensibly to allow him a final opportunity to seek the advice of counsel and pursue administrative remedies. There is no indication in the documents submitted that Petitioner waived that right, yet he was slated for immediate deportation anyway.

■ The proceedings leading up to Petitioner's deportation in 1997 failed to comport with the Fifth Amendment's guarantee of due process and I hold the 1997 deportation order invalid. Because this is not a criminal proceeding under 8 U.S.C. § 1326 and Petitioner's 1997 order for deportation was not premised on a criminal conviction or arrest, there is no requirement that Petitioner demonstrate prejudice before being entitled to relief under 28 U.S.C. § 2241 for due process violations. *See generally Reno v. Flores,* 507

U.S. at 306–08, 113 S.Ct. 1439. *Cf. United States v. Wittgenstein,* 163 F.3d 1164, 1170 (10th Cir.1998)(to prevent use of prior deportation order as predicate for a § 1326 conviction, statute requires alien to show prior order was the result of proceedings that were "fundamentally unfair" which requires showing of prejudice)(citing *United States v. Mendoza–Lopez,* 481 U.S. 828, 837–39, 107 S.Ct. 2148, 95 L.Ed.2d 772 (1987)). *See also United States v. Encarnacion–Galvez,* 964 F.2d 402, 407 (5th Cir. 1992); *Anwar v. INS,* 116 F.3d 140, 144 (5th Cir.1997)(Fifth Circuit cases importing harmless error standard for Fifth Amendment challenges to deportation orders premised on criminal convictions). Even if such were the standard to be applied in this case, that the procedural failures suffered by Petitioner prejudiced him cannot reasonably be denied. While Petitioner may have lacked a basis at the time of his 1997 deportation to seek an adjustment of status and may not have had grounds to prevail on appeal, he may, had he been given a meaningful opportunity for representation or the time an appeal may have afforded him, have elected to depart voluntarily or to apply for discretionary relief before he reentered the country from Mexico after his departure.

### B. *Even Assuming Validity of 1997 Order, Constitutional Concerns with Application of INA § 241(a)(5) in this Case Warrant Habeas Relief.*

Because deportation for unauthorized reentry under INA § 241(a)(5) is under the original order of deportation, a determination that the original order was invalid renders § 241(a)(5) inapplicable in a given case. Because there is no valid deportation order to reinstate, Petitioner becomes what he would have been had he never been identified as subject to reinstatement—an individual eligible for permanent residence and adjustment of status under INA § 245.

Even if I presumed the 1997 Order to have been valid, however, I would have grave concerns regarding the constitutionality of § 241(a)(5) generally and the constitutionality of how it was applied specifically to Petitioner in this case. Although Petitioner did not effectively address the issue until after the March 18 hearing, I have been troubled since the outset by the government's apparent predetermination in December 2002, based solely on the investigation and "findings" of an immigration officer, that Petitioner was subject to reinstatement and then used those "findings" to deny Petitioner's pending I–485 and I–212 applications *before* it initiated any formal reinstatement proceedings against him. Even more troubling is the specter that the government used the pending adjustment applications—which it had already predetermined to deny—as a ruse for requiring Petitioner to appear voluntarily at the INS offices to seek a "renewal" of a work permit the government had no intention of granting in order to effect an easy arrest. That this scenario may be an established practice of the INS rather than an isolated coincidence, *see Castro–Cortez* at 1042–43, evokes a Kafka-esque approach to the rounding up and deportation of illegal immigrants chilling in its imperviousness to principles of due process.

As events unfolded in this case Officer Gibson, in her interview of Petitioner in December 2002, learned Petitioner had been previously deported and had reentered the country illegally. She verified that information in a fingerprint search, *see* 8 C.F.R. § 241.8, no later than January 6, 2003, and used that information to write "denied" in the action block of his pending Form I–485 and I–212 applications effective that date. The INS prepared no formal notice of the decision until January 14, 2003, the day before Petitioner was to

appear to "renew" his work permit. In the meantime, Officer Gibson notified Officer Jumper of the fingerprint match and Officer Jumper prepared his January 15 "narrative" describing the communication from Officer Gibson and the plan to "t[ake] Petitioner into custody" where he "will be served with reinstatement." (Record of Deportable/Inadmissible Alien, Govt. Tab A–6). Clearly Officer Jumper had been told Petitioner would be coming to the INS office on January 15, and he was ready.

There is no place in our system of justice for the secrecy and subterfuge evidenced by the manner in which Petitioner was lured to the INS office to be arrested in this case. A broader concern, however, is with the regulatory provisions that allow INA § 241(a)(5) to be implemented and enforced this way.

In its entirety, INA § 241(a)(5) states as follows:

(5) **Reinstatement of removal orders against aliens illegally reentering**

If the Attorney General finds that an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed, the alien is not eligible and may not apply for any relief under this chapter, and the alien shall be removed under the prior order at any time after the reentry.

8 U.S.C. § 1231(a)(5). In enacting § 241(a)(5), Congress failed to specify the procedures to be used to effectuate reinstatement under its provisions, leaving intact the regulation implementing reinstatement under the predecessor reinstatement statute, § 242(f). That regulation, formerly found at 8 C.F.R. § 242.23 (repealed 1997), charged an IJ with the prerequisite factual determinations for reinstatement, in a public forum, with notice to the alien

at issue. After the enactment of § 241(a)(5) in 1996, however, the INS made an administrative decision to revise its regulations and replaced the existing process with a summary one in which an Immigration Officer alone makes the relevant determinations, away from the eyes of any interested public and without any notice to the affected alien. 8 C.F.R. § 241.8 (2002). The Ninth Circuit explained the evolution of these regulatory provisions in *Castro–Cortez v. INS,* 239 F.3d 1037, 1047–50 (9th Cir.2001), and considered thoughtfully the due process implications of the summary procedures now in effect. The Ninth Circuit expressed "serious doubts as to the constitutionality of these procedures," but refrained from deciding the question because it could rule in favor of the petitioners in that consolidated appeal on the narrower ground that the new reinstatement statute, § 241(a)(5), did not apply to their cases. I express the same doubts, and also refrain from deciding the issue based on my determination that § 241(a)(5) does not apply to Petitioner.

For the foregoing reasons, it is ORDERED that Petitioner Alonso Chacon–Corral's Application for Writ of Habeas Corpus is GRANTED. His present detention under INA § 241(a)(5), codified at 8 U.S.C. § 1231(a)(5), is constitutionally infirm and he is not subject to reinstatement by its terms. IT IS FURTHER ORDERED that Petitioner shall be RELEASED from custody, and the INS shall either reconsider his January 2002 application for adjustment of status under INA § 245 in light of the rulings invalidating his 1997 deportation order or permit him to reapply for adjustment without having to pay an additional $1000 under INA § 245(i).